PUGET SOUND POWER & LIGHT COMPANY, Petitioner,

v.

FEDERAL POWER COMMISSION, Respondent.

No. 75–3523.

United States Court of Appeals, Ninth Circuit.

July 21, 1977.

Rehearing and Rehearing En Banc Denied Sept. 19, 1977.

William S. Weaver, argued, Seattle, Wash., for petitioner.

Philip R. Telleen, Atty., argued, F. P. C., Washington, D. C., for respondent.

Before LUMBARD,* WRIGHT and ANDERSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

## PROCEEDINGS BELOW

In 1964 Puget Sound Power and Light Company (Puget) filed an application with the Federal Power Commission (FPC) seeking a determination that the FPC had no jurisdiction over a hydroelectric project built by Puget in 1904. In the alternative, if jurisdiction was found, Puget sought a license for the project.

The matter was heard by an administrative law judge, who found that the FPC had no jurisdiction over Puget's hydroelectric project and dismissed the application. The FPC reversed the administrative law judge, finding that the project was within the FPC's licensing jurisdiction under the Federal Power Act [16 U.S.C. § 793, *et seq.*] and ordered that Puget's application be treated as an application for a license. Puget sought, but was denied, a rehearing. Pursuant to Section 313(b) of the Federal Power Act [16 U.S.C. § 825*l*(b)], Puget seeks review of the FPC order in this court. We reverse.

## ISSUE

The issue presented in this case is whether the FPC has licensing jurisdiction over the Electron hydroelectric project which was built, owned and operated by Puget. To decide this question requires a determination of whether certain repair and restoration of the project made after 1935 was "construction" of the facility as that term is used in Section 23(b) of the Federal Power Act [16 U.S.C. § 817]. We hold that the FPC does not have licensing jurisdiction over Puget's Electron project because the repair and restoration were not performed to "construct a dam or other project works."

## BACKGROUND

In 1904 Puget built the Electron hydroelectric generating project on the Puyallup River in Washington state. The Puyallup is on the western slope of Mt. Rainier and is non-navigable. The project basically consisted of an upstream diversion dam, a flume, and a powerhouse. The dam diverted water down the flume to the powerhouse where the electricity was generated by four turbine generators. Total electrical output was and still is 26,400 KW.

* The Honorable J. Edward Lumbard, Senior United States Circuit Judge, Second Circuit, sitting by designation.

In 1936 a large portion of the facility was destroyed by a landslide and had to be rebuilt. Putting the plant back into operation consisted of first cleaning up the debris and salvaging everything that was salvageable. Turbine generator units 1 and 2 were cleaned up, repaired and put back into service in 1937. Because of the low demand for electricity at the particular time, units 3 and 4 were not repaired and placed back into service until 1941. Large portions of the flume were destroyed by the landslide and had to be replaced as well. This repair of the facility restored the project to its original configuration and electrical generating capacity. Power from the project was and is generated in interstate commerce.

## JURISDICTION OF THE FPC AND THE FEDERAL POWER ACT

Jurisdiction of a governmental agency over an industry can be defined as the power which that agency may exercise over that industry under applicable law. In the case of a federal agency such as the FPC, such power is determined by the extent of the grants which have been made to it by Congress.[1]

Congress established the Federal Power Commission in the Federal Water Power Act of 1920,[2] and gave it certain powers, including § 4(d),[3] the authority to issue licenses for construction of projects in the navigable waters of the United States. However, on non-navigable streams (such as the Puyallup River) the FPC's licensing power was limited. Under Section 23[4] of the 1920 Act, a person *intending* to construct a project on a non-navigable stream could *in his discretion* file a declaration of his intention with the FPC. Once this declaration of intent was filed, then the FPC would investigate the situation. If it found that the project would affect the interests of interstate or foreign commerce, it could require a license before construction could

---

1. Benton, *Jurisdiction of the Federal Power Commission and of State Agencies in the Regulation of the Electric Power and Natural Gas Industries*, 14 George Washington Law Review 53 (1945).

2. 41 Stat. 1063 (1920). As noted *infra*, this Act was later amended by Title II of the Public Utility Act of 1935, 49 Stat. 838, 16 U.S.C. §§ 791–823, and made part I of the Federal Power Act.

3. § 4(d), 41 Stat. 1065, 1066, now § 4(e) of the amended Act, 16 U.S.C. § 797(e), read, in pertinent part, as follows:

   "The Commission is authorized and empowered—
   (e) To issue licenses to citizens of the United States, or to any association of such citizens, or to any corporation organized under the laws of the United States or any State thereof, or to any State or municipality for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the [navigable waters of the United States], or upon any part of the public lands and reservations of the United States (including the Territories),
   or for the purpose of utilizing the surplus water or water power from any Government dam, except as herein provided . . . ."

4. § 23, 41 Stat. 1075 (1920), in pertinent part reads as follows:

   "Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined herein [this chapter] as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce between foreign nations and among the several States, may in their discretion file declaration of such intention with the commission, whereupon the commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality, shall not proceed with such construction until it shall have applied for and shall have received a license under the provisions of this Act. If the commission shall not so find, and if no public lands or reservations are affected, permission is hereby granted to construct such dam or other project works in such stream upon compliance with State laws."

go forward. If no declaration of intent was filed, the FPC was without power to investigate or issue a license. Clearly, this did not give the FPC much control over projects on non-navigable streams.

To remedy this situation, Congress in 1935 amended parts of the 1920 Act, including Section 23. The new Section 23(b) [16 U.S.C. § 817] [5] makes it mandatory that anyone "intending to construct a dam or other projects works" on a non-navigable stream file a declaration of intention and then come before the FPC for a determination of whether the interests of interstate or foreign commerce would be affected. If these interests are affected, a license is required.

Under *Federal Power Commission v. Union Electric Co.*, 381 U.S. 90, 85 S.Ct. 1253, 14 L.Ed.2d 239 (1965) (commonly referred to as the *Taum Sauk* case), generating power in interstate commerce (as the Electron project does) "affects" the interests of interstate commerce such as to call into play the licensing jurisdiction of the FPC under Section 23(b). The question which arises here is whether the mandatory filing and licensing requirements of Section 23(b) apply to the Electron project at all. As mentioned, the Electron project was originally constructed in 1904, long before the mandatory filing and licensing requirements of the section came about.

We find that the mandatory filing and licensing requirements of Section 23(b) are not retroactive, *Farmington River Power Co. v. Federal Power Commission*, 455 F.2d 86 (2nd Cir. 1972). One of the first rules of statutory construction is that legislation must be considered as addressed to the future, not to the past. Retrospective operation will not be given to a statute unless such is the manifest intention of the legislature, *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 11 L.Ed.2d 576 (1964). We agree with the *Farmington* court that:

> "Although the legislative history [of Section 23(b)] contains little on the subject, there is no indication that Congress intended that the filing requirement for nonnavigable waters was to be retroactive." 455 F.2d at 90.[6]

The "construction" contemplated by Congress in Section 23(b) should apply to only new "dam[s] or other project works" begun

---

5. § 23(b), 16 U.S.C. § 817, as amended in 1935, reads as follows:

"It shall be unlawful for any person, State, or municipality, for the purpose of developing electric power, to construct, operate, or maintain any dam, water conduit, reservoir, power house, or other works incidental thereto across, along, or in any of the navigable waters of the United States, or upon any part of the public lands or reservations of the United States (including the Territories), or utilize the surplus water or water power from any Government dam, except under and in accordance with the terms of a permit or valid existing right-of-way granted prior to June 10, 1920, or a license granted pursuant to this chapter. *Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission*, whereupon the Commission shall cause immediate investiga-

tion of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State, or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State laws." (emphasis added)

6. *See, e. g.*, S.Rep. No. 621, 74th Cong., 1st Sess. 47 (1935) and H.R.Rep. No. 1318, 74th Cong., 1st Sess. 26 (1935). One commentator has expressed the view that the retroactive compulsion of a license to projects existing before the 1935 amendments would be particularly unjust. LeBoeuf, *An Industry Appraisal of Federal Regulation of Electric Utilities under the Federal Power Act*, 14 George Washington Law Review 174 (1945).

after 1935. The statute itself and the legislative history use the prospective terms "intending to construct" which indicates to us that the statute is to apply only to projects *begun* after the effective date in 1935.[7]

Since the mandatory filing and licensing requirements of Section 23(b) which give the FPC jurisdiction over hydroelectric projects are not retroactive to pre-1935 projects, the only avenue left open to the FPC to obtain jurisdiction over the Electron project is to contend that the post-1935 repair and restoration of the project was "construction" of the project. Puget agrees that if this court finds that the repair and restoration performed after the 1936 landslide was "construction" as that term is used in Section 23(b), then the project would come under the FPC's licensing jurisdiction. Puget strenuously argues, however, that such repair and restoration was not "construction" as the term is used in the statute.

We agree with Puget's argument and decline to engage in strained statutory language construction which would equate repair and restoration of an existing facility to mean the same thing as "intending to construct a dam or other project works."

In the *Farmington* case, *supra*, the Second Circuit found that the FPC had no licensing jurisdiction over a hydroelectric project which was constructed prior to 1935 and "which remains essentially unchanged today." The FPC concedes that under that holding "such a project can be maintained as originally constructed without becoming jurisdictional." (FPC opening brief, p. 32). The FPC argues, however, that the instant case is different from the *Farmington* case because the post-1935 work performed by Puget "amounted to much more than mere repair and maintenance needed to keep Electron operating as originally constructed.[8]

What is repair and maintenance depends on the particular circumstances. While a fortuitous and unfortunate event may occasion extensive maintenance and repair (as here), the mere fact of magnitude alone should not result in a conclusion that it is "construction" in the sense used by Congress. We think Congress intended no such result.

While the FPC in its decision finding jurisdiction placed some reliance on the fact that Puget's post-1935 activity extended the life of the project, and caused its production of electricity to be more reliable (T.R. 540), we find this to be of no moment in deciding the question of whether or not this activity was "construction". Even minor routine repair and maintenance could be and usually is designed to extend the life of the project and make production more reliable.

Seemingly, the FPC also relied on an unconfirmed newspaper account that Puget considered abandoning the project. (T.R. 539) Apparently, the reasoning here was that if Puget considered abandoning the project, then decided against it and instead

---

7. Support for this can also be found in the *Farmington* case, *supra*. In discussing the effect of the mandatory filing and licensing requirements of Section 23(b), the court stated:

"In other words, after 1935 one *initiating* a project no longer had the choice to refrain from filing a declaration of intention with the Commission, and the only *new* projects not requiring licenses were those on non-navigable waters which the Commission found would not affect interstate commerce." (455 F.2d at 90) (emphasis added)

8. In its Order Establishing Jurisdiction (T.R. 533, 540) the FPC tries to distinguish *Farmington* on the grounds that in that case "only minor maintenance and repairs" were involved as opposed to the substantial ones in the instant case. As Puget points out in its application for rehearing (T.R. 543, 545) before the FPC, the record in the *Farmington* case shows that the repairs and maintenance were not so "minor" as the FPC suggests. For example, significant work with materials or equipment after August 25, 1935, consisted of: (1) repair of the tow of the apron of the dam; (2) strengthening of the wing wall; (3) strengthening and heightening of the abutments and of the earthen dykes on north bank of the pond, thereby increasing freeboard by four feet (at the same time certain pedestals for equipment at the top of the dam were raised); (4) installation of anchor rods; and (5) periodic replacement of rotted or destroyed flash boards.

# 1316

repaired and restored the project, then such activity would constitute "construction". We disagree. Even if we were to assume that Puget had "considered" abandoning the project, we are not furnished with any authority, nor have we discovered any, which holds that one abandons or forfeits a vested right by merely "considering" the options and alternative actions which are available. Likewise, we do not believe it tenable to hold, in effect, that an act of God such as the 1936 landslide creates an abandonment or forfeiture of "grandaddy" rights to continue to operate as a facility exempt from FPC jurisdiction.

The repairs we are involved with here, though substantial, merely restored the Electron project to its original specifications and configuration. There was no new "construction". Not one repair made by Puget has in any way enabled the project to operate on the Puyallup River any differently from its pre-1935 design or its pre-1935 operation. No project enlargement occurred either in capacity, diversion, or physical plant. The original sites for the powerhouse, the dam and the flume are the same now as pre-1935 and are still in use. As mentioned above, the electrical generating capacity remains the same today as before 1935. We find that the only construction on this project has been to maintain and operate it in the same manner as when originally constructed in 1904.

## CONCLUSION

As discussed, Congress intended that the FPC have jurisdiction over projects constructed after 1935 and which affect interstate commerce. Because this statute is not retroactive and the Electron project was built before 1935, the project is a facility exempt from the licensing jurisdiction of the FPC. Under the particular facts and circumstances of this case, we conclude that repairs—even those of substantial nature—do not confer jurisdiction over an otherwise exempt facility. Section 23(b) of the Federal Power Act just does not so provide. Therefore, the FPC's finding of jurisdiction is reversed with directions to dismiss the application.