**AQUENERGY SYSTEMS, INC., as General Partner of Aquenergy II Limited Partnership, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 87–3853.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1988.

Decided Sept. 19, 1988.

Rehearing Denied Oct. 14, 1988.

proceeding for redress....

Bradford Wyche (Henry L. Parr, Jr., Frank S. Holleman, III, Wyche, Burgess, Freeman & Parham, P.A., Greenville, S.C., on brief), for petitioner.

Joseph Davies (Catherine C. Cook, Gen. Counsel, Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., on brief), for respondent.

Before RUSSELL and PHILLIPS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

The question is whether Aquenergy is required to apply to the Commission and obtain a license for the operation of a small hydroelectric project. The answer to that question, in turn, depends upon whether certain "construction" activity in 1984–1985 was post–1935 construction within the meaning of § 23(b) of the Federal Power Act of 1935. 16 U.S.C.A. § 817(1) (West Supp.1988). The Commission ruled that it was and asserted its jurisdiction.

The Commission had long had regulatory authority over such projects in navigable waters, but until 1935, one undertaking any activity in non-navigable waters was not required to apply to the Commission for anything. The Congress undertook to change that in 1935 to the extent that construction of a new project was involved. It enacted § 23(b) which requires one "intending to construct a dam or other project works" in a non-navigable stream to apply to the Commission for a license if the project were within federal jurisdiction to regulate commerce with foreign nations and among the several states. If the Commission determined that it had jurisdiction, it would then consider whether or not a license should issue.

The provision operates prospectively and has no application to projects constructed before the enactment of § 23(b) in 1935. *Farmington River Power Co. v. Federal Power Comm'n*, 455 F.2d 86, 88–91 (2d Cir.1972). Construction activity in the maintenance and repair of existing projects is not post–1935 construction within the meaning of the statute. *See Puget Sound Power & Light Co. v. Federal Power Comm'n*, 557 F.2d 1311, 1315 (9th Cir. 1977).

## I.

Near the turn of the century, a textile manufacturing company constructed a small hydroelectric project on Coneross Creek in Oconee County, South Carolina. It is undisputed that the affected waters of Coneross Creek are non-navigable, and there is no room for doubt that normal maintenance and repair activity after 1935 would not require the operator to apply for or obtain a license from the Commission.

After several changes in ownership, the Coneross project was acquired by J.P. Stevens & Co., Inc. It remained in operation until 1953 when Stevens shut it down. The land and stream were left to return to their natural condition, and for approximately 30 years there was no activity at the project, not even minimal maintenance. At some time the turbine was removed. The powerhouse, itself, disintegrated or was torn down. By 1984, only its foundation remained.

The dam remained substantially intact, but there was no attempt to keep the project in condition for a resumption of operation. There was much silt in the lakebed, and trees had reestablished themselves on the old stream banks. From all that appears, nothing was done during those 30 years to impede nature's reclamation of what had been her own.

In 1984 Aquenergy acquired the site and undertook the reconstruction of the hydroelectric project in its former image. It was no simple undertaking. While the dam was essentially intact, there had been not even routine maintenance upon it for more than 30 years. The road into the site had to be improved and the dam put in operable condition. The reservoir bed had to be cleared. Trees almost 30 years old had to be felled, underbrush cleared out and accumulated silt flushed out. A powerhouse had to be constructed and a new turbine installed in it.

While the requisite reconstruction activity was substantial, Aquenergy carefully planned it to meet the specifications of the original project that had been constructed more than 80 years earlier. While the turbine was a new one, it had the same designed capacity as the old one. The head of the reservoir was the same. The reconstructed plant generates the same amount of electricity as the original. While the power plant and the turbine are new, the entire project conforms to the design and specifications of the original placed in operation more than 80 years earlier.

## II.

The statute does not define the word "construct" as used in § 23(b) when it was enacted in 1935. It is evident, however, that the Congress in making this statute applicable to one "intending to construct a dam ..." intended a prospective operation of the statute only. One operating an existing hydroelectric plant in a non-navigable stream was not required to notify the Commission of what was already in place at the time of enactment of the statute or to apply to the Commission for any license. It necessarily follows that the Congress did not intend § 23(b) to apply to ordinary maintenance, repair and reconstruction activity. An existing project could continue to be operated despite the need from time to time to perform work upon it to keep it in good operating condition. That was the holding of the court in *Farmington.* 455 F.2d at 90.

At the same time, the statute could hardly be construed to authorize work which would substantially enlarge or change an existing plant. This, Aquenergy recognized when it painstakingly followed the original design and plan of the project.

■ The magnitude of the work is not controlling. One must look to the nature of the work and the purpose of the owner. Major repairs may involve much construction activity, but the project is not brought within the Commission's jurisdiction if work done in the name of repair does not so alter the project that it is no longer what was there before 1935.

The principle is illustrated by *Puget Sound Power & Light Co. v. Federal Power er Comm'n,* 557 F.2d 1311 (9th Cir.1977). There, it appeared that in 1904 the power company had constructed a hydroelectric

project in a non-navigable stream on the slopes of Mount Rainier. There was a diversion dam that diverted water into a flume. The flume carried the water down to a powerhouse in which there were four turbines. In 1936, a large landslide caused major damage to the project. Much of the flume was destroyed and the powerhouse and the turbines damaged. *Id.* at 1312–13.

Rather promptly, the power company cleared up the mess and replaced or rebuilt the flume. Turbines # 1 and # 2 were cleaned, repaired and returned to service. Turbines # 3 and # 4 were returned to service some four or five years later when demand for the project's output increased. *Id.* at 1313.

The work involved at Puget Sound was substantial, but the Court of Appeals for the Ninth Circuit held that it was repair work and that the entire project remained beyond the Commission's jurisdiction. After the repairs it was the same project that was in operation in 1935, approximately 30 years after its initial construction. *Id.* at 1315–16.

Aquenergy puts great reliance upon *Puget Sound,* but it does not help them, for we take no issue with the proposition that the magnitude of the work is not controlling or even relevant. The relative magnitude of the work in *Puget Sound* may have been comparable to that involved here, but the owner had never abandoned the project. It had moved rather promptly to put the project back into partial operation and in full operation when demand for its output justified it.

In great contrast, here, J.P. Stevens simply abandoned the project. The entire thing was closed down. The turbine was apparently removed, but the rest was left for deterioration to take its toll and nature to heal her wounds. After such complete abandonment over a period of more than 30 years, there is no basis for a claim that the owner retained operating rights. The statute was designed to keep in operation projects existing in 1935, but not to restore abandoned rights.

Indeed, it was argued in *Puget Sound* that a forfeiture had occurred because Puget Sound considered whether or not to abandon its project and delayed placing turbines # 3 and # 4 back into operation until market demand justified it. 557 F.2d at 1315–16. When there is major damage to a project, any prudent owner will assess the economic feasibility of reconstruction and restoration. Here, J.P. Stevens must have done just that, but its conclusion was to abandon the entire project and to make no attempt to keep it operable. Indeed, at the time of abandonment, the record shows no need of major repair activity; every indication is that the project was abandoned because its continued operation was simply uneconomical.

Section 23(b) was designed to protect the rights of owners to continue to operate projects in existence in 1935; but not to permit a new entrepreneur to start a new business cast in the image of one that had once existed but had been abandoned for more than 30 years.

### III.

Aquenergy now contends that the Commission lacks jurisdiction because operation of the project does not affect interstate commerce. We decline to consider this contention because it was not presented to the Commission.

Before the Commission Aquenergy's contention that the Commission lacked jurisdiction was founded entirely upon the principle derived from *Puget Sound.* There was no mention of the effect of the project upon interstate commerce.

We will not consider a contention not presented to, or considered by, the Commission. 16 U.S.C.A. § 825*l*(b) (West 1985); *Consolidated Gas Supply Corp. v. Federal Energy Regulatory Comm'n,* 611 F.2d 951, 958–59 (4th Cir.1979); *Rhode Island Consumers' Council v. Federal Power Comm'n,* 504 F.2d 203, 212–13 (D.C.Cir. 1974).

### IV.

We affirm the decision of the Commission.

AFFIRMED.