**HABERSHAM MILLS, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 91–8790.

United States Court of Appeals, Eleventh Circuit.

Nov. 10, 1992.

Scott M. Phelps, John E. Goodman, Bradley Arant Rose & White, Birmingham, Ala., for petitioner.

Lois M. Cashell, Secretary, F.E.R.C., Jerome M. Feit, Sol., Samuel Soopper, Washington, D.C., National Marine Fisheries Service, N.E. Regional Office, Legal Dept., Gloucester, Mass., G.R. Cothran, III, Parks and Historic Sites Div., Dept. of Natural Resources, Atlanta, Ga., Eric Christensen, F.E.R.C., Washington, D.C., for respondent.

Before KRAVITCH and COX, Circuit Judges, and DYER, Senior Circuit Judge.

PER CURIAM:

This appeal challenges the jurisdiction of the Federal Energy Regulatory Commission (the "Commission") to require licenses for two small hydroelectric projects on a nonnavigable river in Georgia. The sole issue is whether the Commission correctly determined that the projects affect interstate commerce within the meaning of 16 U.S.C. § 817(1) (1988). We affirm the Com-

mission's orders asserting jurisdiction over the projects.

## BACKGROUND

Habersham Mills ("Habersham") operates a textile factory in Habersham County, Georgia. It owns two small dams and power houses on the Soque River, a non-navigable tributary of the Chattahoochee River. The projects were built before 1935, but each has undergone post–1935 construction or modification.

The two power houses together supply about thirty percent of the factory's electricity. Their combined generating capacity is 1840 kilowatts, although they average less than 1000. Habersham buys the rest of its electricity from Georgia Power Company. Until April 1991, Habersham occasionally sold small amounts of excess electricity to Georgia Power. The factory halted the sales after the Commission began the proceedings in this case.

The Commission's director of hydropower licensing claimed jurisdiction over the Habersham projects in an April 1990 order. The order instructed Habersham to begin initial steps toward applying for federal licenses. Habersham appealed to the Commission, which eventually issued a series of decisions confirming the licensing order. First, the Commission found that it had jurisdiction over one Habersham project, but withheld a final say on the second project for further fact finding. *Habersham Mills*, 55 F.E.R.C. ¶ 61,158 (1991) (order denying rehearing as to one project but granting stay as to second project). Two months later the Commission required a license for the second project as well. *Habersham Mills*, 56 F.E.R.C. ¶ 61,077 (1991) (order denying rehearing and dissolving stay).

Finally, in an order denying reconsideration, the Commission stated that licenses remained necessary even though Habersham had ceased all sales of excess electricity to Georgia Power. *Habersham Mills*, No. UL90–6–002 (issued Dec. 19, 1991) (to be reported at 57 F.E.R.C. ¶ 61,351). In each of its orders, the Commission declared that the Habersham projects affect inter-state commerce by altering the supply of, or the demand for, electricity flowing across state lines.

## STANDARD OF REVIEW

■ Where Congress has not itself explained the meaning of disputed statutory language, this court defers to the agency that administers the statute if the agency's interpretation is reasonable. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984); *U.S. Mosaic Tile Co. v. N.L.R.B.*, 935 F.2d 1249, 1255 (11th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 871, 116 L.Ed.2d 776 (1992). We will affirm the Commission's factual findings if they are supported by "substantial evidence." 16 U.S.C. § 825*l* (b) (1988).

## DISCUSSION

At the center of the present disagreement is section 23(b) of the Federal Power Act (FPA), 16 U.S.C. § 817(1) (1988). Among other things, the statute gives the Commission licensing authority over certain hydroelectric projects on nonnavigable streams that Congress may regulate through its commerce power. No hydroelectric project built or modified after 1935 may be operated on such a stream without a federal license if the project affects "the interests of interstate or foreign commerce." *Id.*

There is no question that the statute applies to the Soque River. Nor does Habersham contest on this appeal the findings of post–1935 construction at the factory's projects. Habersham does object to the Commission's determination that the two small dams affect interstate commerce.

### 1. The Absence of Electricity Sales by Habersham

■ Habersham contends that its projects are beyond the Commission's jurisdiction because the factory no longer sells excess electricity to Georgia Power. For this proposition Habersham relies heavily on a footnote in *Federal Power Commission v. Union Electric Co.*, 381 U.S. 90, 110 n. 29, 85 S.Ct. 1253, 1264 n. 29, 14

L.Ed.2d 239 (1965). The Supreme Court there stated: "The project located on a nonnavigable stream, without any effect on navigability and water commerce and without any interstate sales, may well have no effect on commerce among the States and thus be beyond the power of Congress under the Commerce Clause." *Union Elec.*, 381 U.S. at 110 n. 29, 85 S.Ct. at 1264 n. 29.

Whatever weight it merits in our analysis, the footnote stops short of drawing the jurisdictional boundary that Habersham desires. The Supreme Court, in the process of explaining another point, simply observed that a project without interstate sales *may* not affect commerce. It did not rule out the possibility that such a project *would* affect commerce. We still must consider the specific facts before us to answer the question as it pertains to Habersham.

### 2. Individual or Class Effect on Commerce

Habersham also challenges the way in which the Commission evaluated the projects' effect on interstate power consumption and generation. In Habersham's view, the impact of its dams is too trivial to justify federal regulation under the Commerce Clause. Rather than focus only on the particular effect of the Habersham projects, though, the Commission considered the cumulative effect of a class of small projects that includes the Habersham dams. Habersham contends that the Commission misapplied the statute by looking beyond the two projects at issue.

■ The Supreme Court has stated that Congress "drew upon its full authority under the Commerce Clause" in enacting the statute. *Union Elec.*, 381 U.S. at 96, 85 S.Ct. at 1257. Full authority under the Commerce Clause includes the power to reach a local activity whose effect on commerce, "taken together with that of many others similarly situated, is far from trivial." *Wickard v. Filburn*, 317 U.S. 111, 128, 63 S.Ct. 82, 90, 87 L.Ed. 122 (1942). In the present context, a small hydroelectric project that affects commerce only slightly would still be subject to congressional regulation if it is part of a class with a significant cumulative effect.

■ While agreeing that Congress could reach small projects if it so desired, Habersham maintains that § 817(1) bestows a more limited range of authority on the Commission by requiring an investigation of each *individual* project. The statute instructs the Commission, upon being notified of a planned project, to determine whether "such proposed construction" will affect interstate commerce. 16 U.S.C. § 817(1). We see nothing in § 817(1), however, that restricts the way in which the Commission may determine or assess a particular project's effect on interstate commerce. In light of the statute's unqualified language, we cannot say that Congress wanted the Commission to use an untypically narrow Commerce Clause test here. We hold, therefore, that the Commission's interpretation of § 817(1) is reasonable, and that the Commission did not misapply the statute by considering the cumulative effect of a class of small hydroelectric projects that includes the Habersham dams.

### 3. Evidence of an Effect on Commerce

■ The Commission provides a somewhat involved explanation of its finding that the Habersham dams affect interstate commerce. The explanation begins by establishing a connection—albeit an indirect one—between the Habersham projects and the interstate "grid" of power generation. The connection comes by way of the factory's purchase of electricity from Georgia Power. Georgia Power's generating facilities in turn are linked electromagnetically to those of utilities in other states. Any change in Georgia Power's load produces a corresponding change in the grid as a whole.

Thus, by supplying thirty percent of Habersham's needs, the two small Habersham projects effectively displace electricity that the factory otherwise would draw from the interstate grid via Georgia Power. Under current Commerce Clause jurisprudence, this connect-the-dots logic suffices to establish an effect on commerce. *Cf. Wickard*, 317 U.S. at 127–29, 63 S.Ct. at 90–91 (holding that wheat grown for home consumption affected interstate commerce by reducing overall market demand for wheat).

Next, the Commission refers to statistics on the combined generating capacity of hundreds of small hydroelectric projects around the nation. *See* Federal Energy Regulatory Comm'n, *Hydroelectric Power Resources of the United States* (1988) [hereinafter *1988 Hydro Report*]; Federal Energy Regulatory Comm'n, *Hydroelectric Power Resources of the United States* (1984). These reports indicate that the small projects collectively account for a substantial portion of the nation's hydroelectric generating capacity. For example, the 1988 figures show that 2531 existing or planned hydroelectric plants had a total capacity of 3.4 million kilowatts. *1988 Hydro Report* at xxxvii.

As Habersham points out, the small-project category contains some plants that are two to three times larger than the Habersham projects. The category also fails to distinguish between those that sell electricity and those that merely consume what they generate. Nevertheless, there is adequate information from which to glean a cumulative effect from an appropriate class of projects. The reports list several hundred facilities with generating capacities equal to or less than the Habersham projects. And whatever they do with their electricity, the small projects displace power that otherwise would be generated by facilities connected to the interstate grid.

We hold that substantial evidence supports the Commission's conclusion that Habersham affects interstate commerce by displacing power from the grid and that the cumulative effect of similar projects is significant.[1]

Our holding in this regard does not run counter to the Ninth Circuit's decision in *City of Centralia v. Federal Energy Regulatory Commission,* 661 F.2d 787 (9th Cir.1981), on which Habersham bases much of its argument. In *City of Centralia* the court vacated a Commission order directed at a municipal hydroelectric plant that supplied sixty percent of the city's electricity. Looking at the record before it, the court

saw no evidence of a significant individual effect on interstate commerce. The court further found that the Commission in that instance had "never identified any class of projects to which [the Centralia plant] may belong to show that activities at such plants have a substantial cumulative effect." *Id.* at 793. Unlike the record in *City of Centralia,* though, the evidence in this case does include substantial evidence indicating the cumulative effect of a relevant class of projects.

### 4. The Extent of the Commission's Jurisdiction

Habersham makes a final argument grounded more on policy than on law. The Commission's reasoning here, Habersham warns, would saddle virtually all hydroelectric plants with onerous federal licensing requirements.

The present case, though, does not require us to address such a theoretical extreme. We base our decision on the facts before us and the statute as we find it. Whatever limits § 817(1) may or may not place on the Commission's jurisdiction in other situations, the Commission has not exceeded its authority by requiring licenses for the Habersham projects. As Justice Black wrote four decades ago, "Regardless of whether it might have been wiser and more farseeing statesmanship for Congress to have made such an exception, we should not do so through the interpretative process." *Federal Power Comm'n v. East Ohio Gas Co.,* 338 U.S. 464, 474, 70 S.Ct. 266, 272, 94 L.Ed. 268 (1950).

### CONCLUSION

We affirm the Commission's orders directing Habersham to seek licenses for the factory's two hydroelectric projects.

**AFFIRMED.**

---

1. The Commission also refers to an explicit congressional finding in the Public Utilities Regulatory Policy Act (PURPA), 16 U.S.C. §§ 2601–2645 (1988), that small power production facilities affect interstate commerce. Because we

conclude on other grounds that the Commission properly considered the cumulative effect of small hydroelectric projects, we need not consider whether or how the PURPA finding applies to the separate act at issue here.