FERC v. Macdonald                         CV-90-530-B    03/30/94 P

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE


Federal Energy Regulatory Commission

        v.                                      Civil No. 90-530-B

Winslow H. Macdonald


                            O R D E R


        This is a civil action brought by the Federal Energy

Regulatory Commission ("FERC" or "Commission") seeking

declaratory relief and a civil penalty against Winslow H.

MacDonald for his alleged failure to comply with certain terms

and conditions of a hydroelectric power license issued by FERC.

        Presently before the court are defendant's Motion for

Summary Judgment or in the Alternative for Partial Summary

Judgment (document 32), and the plaintiff's Motion for Summary

Judgment (document 37).[1]

_____

        [1]These motions were reassigned to me on or about February
28, 1994.

# I. FACTS[2]

1. Venue and jurisdiction for this case exist in the United States District Court for the District of New Hampshire.

2. Plaintiff, FERC is an independent agency of the United States with authority to license and regulate hydroelectric generating facilities. The Commission brings this action pursuant to the authority conferred by the Federal Power Act (the Act).

3. Defendant, Winslow H. Macdonald, trustee of the Milford Elm Street Trust, is the licensee of a hydroelectric generating facility located on the Souhegan River in Hillsborough County, New Hampshire that is known as the Pine Valley Project (Project). Macdonald is being sued in his capacity as licensee. The Milford Elm Street Trust has been the owner of the Project since 1979.

4. Mr. David Blackmer is the sole beneficiary of the Milford Elm Street Trust. Mr. Blackmer is also the owner and president of a construction company known as Earthworks, Inc., which performed all of the work at the Project in 1987 and 1988. Mr. Blackmer was acting on behalf of the defendant for all work at the Project described below.

---

[2] The following facts are taken verbatim from the parties' stipulation as to uncontested issues of fact.

5. The Commission has five regional offices and each one is headed by a Regional Director, who was formerly called a Regional Engineer. The Commission's New York Regional Office ("NYRO") is responsible for overseeing work on hydroelectric projects in 12 states, including New Hampshire. The NYRO's duties include inspecting hydroelectric projects for adequate construction and operation, and monitoring projects for compliance with licensing requirements and safety regulations. The NYRO monitors the Project.

6. Mr. James Wing is a civil engineer with the NYRO. In 1987 and 1988, Mr. Wing was assigned to and was responsible for inspecting hydroelectric projects in New Hampshire, including the Project. Mr. Wing's supervisors at that time were Mr. Martin Inwald, the NYRO Regional Director (also known as the Regional Engineer) and Charles Goggins, a supervisory Civil Engineer in the NYRO. Mr. Wing did not see or inspect the Project until about September 1989, after all work at issue in this proceeding ha[d] been completed.

7. The New Hampshire Water Resources (WRB) issued an order to defendant on October 29, 1979 requiring him to make certain designated structural repairs to the dam within two years. This 1979 WRB order is the only order issued by the state of New

3

Hampshire that required construction work at the Pine Valley Project from 1979 until after November 23, 1988.

8. When defendant filed the application with FERC for the Project license in 1985, the Project was not then generating power and had not generated power since 1977. At the time of the license application, the Project consisted primarily of the following elements: a 200-foot long, 23-foot high concrete, stone, and masonry dam; a reservoir with a surface area of about five acres; a 42' x 38' wooden gatehouse; a 2,700-foot long power canal; and a powerhouse located in a former mill building, containing a generating unit with a capacity of 525 kilowatts.

9. The license application contained, <u>inter alia</u>, Exhibit A which identified the existing facilities at the Pine Valley Project and described proposed installations, dam improvement, completion of work to install steel penstock pipe in the existing lower canal, and installation of a "suitable lowhead turbine generator" at the dam site. By 1982, a substantial portion of the 96-inch diameter penstock pipe had been installed in the canal and buried. The license application stated that portions of the penstock near the dam and under a railroad trestle had not been installed. The penstock carries water from the dam to the powerhouse. Exhibit A specifically described past and future

4

penstock work and all work proposed for the Project.  The license application also contained Exhibits F-1 through F-6 and Exhibits G and G-2, which included site plans, maps and drawings of the Project.  These Exhibits showed the existing facilities at the Pine Valley Project, as well as work defendant proposed to do after the Commission issued a license for the Project.

10.  On October 16, 1987, FERC issues a license to defendant for the Pine Valley Project.  The license is set forth at 41 FERC ¶ 62,049 (1987).  The license is subject to the terms of the Act, which is incorporated by reference as part of the license, as well as the Commission's regulations found in 18 C.F.R. Part 12.

11.  On or about November 24, 1987, Martin Inwald sent, and defendant received, a letter directing defendant's attention to Articles 4, 301, 302 and 303 of his license.  This letter repeated some of the defendant's obligations that are also contained in the license and the FERC regulations.

12.  Defendant completed the installation of the penstock by placing lengths of pipe in the power canal next to the gatehouse and under the railroad trestle between approximately October 28, 1987 and December 15, 1987.  The work involved excavation and grading, placing drain pipes in the canal, banding and bolting the final sections of the pipe together, backfilling around the

5

pipe, covering the pipe with geotextile material, and covering it to grade with fill. Defendant installed the 6-foot diameter penstock under the railroad trestle using two concrete junction boxes that allowed for a transition from a single 96-inch diameter pipe leading up to the railroad track to two parallel six-foot diameter pipes running underneath the tract and back to the 96-inch diameter pipe on the other side. The use of the parallel six-foot diameter pipes was to avoid major excavation and/or the removal of a portion of the railroad track.

13. The sections of the 96-inch diameter penstock pipe installed at the Project in 1987 were 20-feet long and weighed 5,000 pounds each. In order to move sections of penstock into position, defendant used heavy equipment such as a front end loader and an excavator.

14. On or about October 4, 1988, defendant began work along the left bank of the river, immediately downstream of the dam. Defendant excavated an area that was approximately 25 feet by 45 feet and 12 feet deep. The excavated area included land along the river bank and land from the river bed. After defendant finished digging, he placed gravel and then poured a concrete slab in the excavation, leaving a cavity in the slab to accommodate future installation of a draft tube for a low-flow

generator.

15.  Defendant built a temporary structure to divert water from the excavation area and employed pumps to remove water that accumulated in that work area.  The diversion structure was an embankment consisting of rocks and gravel excavated from the river bed, about 20 - 25 feet wide at its base, approximately 60 feet long, with an average height of 4 - 6 feet.  Mr. Steven Paro, an Earthworks employee, placed the excavation materials in the river, parallel to the direction of flow.  Mr. Michael Young, Sr., another Earthworks employee, supervised Mr. Paro's work. Placement of the excavation material was at Mr. Blackmer's direction.  This embankment narrowed the channel of the Souhegan River and was intended to help reduce the amount of water in the excavation area in order to provide a dry area for the workers. The embankment connected to the bank downstream of the excavation to prevent back flow of water into the excavation work area.

16.  The drawing made by Mr. Blackmer at his deposition in January 9, 1992, accurately depicts an aerial view of the embankment defendant placed at the Pine Valley Project in October and November, 1988.

17.  Defendant began generating power at the Pine Valley Project on March 28, 1988.  Defendant generated approximately

727,680 kilowatt hours of electric power and received gross revenues of approximately $60,217 from the time he commenced operations in March until November 23, 1988. Defendant sold this power to Public Service Company of New Hampshire.

18. On or about November 21, 1988, David Blackmer received a telephone call from James Wing of the NYRO. When Mr. Blackmer described the status of the work, Mr. Wing ordered him to cease and desist all work. Defendant ceased work at the Project in compliance with this order. This telephone conversation was followed up by a letter from Martin Inwald to defendant, dated November 23, 1988, which also directed defendant to file a report detailing the work performed and to submit a schedule for compliance with license Articles 302 and 303.

19. The Commission issued a notice of Proposed Penalty (Notice), dated February 14, 1990, proposing a civil penalty to defendant in the amount of $100,000 for his allegedly violating FERC regulations at 18 C.F.R. § 12.23.

20. On March 21, 1990, defendant replied to the Notice by filing with the Commission a Notification of Election and Answer (Answer). Defendant's response denied the allegations and elected district court review of any penalty that ultimately might be assessed.

8

21. On September 21, 1990, the Commission issued an Order Assessing Civil Penalty in which it rejected the arguments set forth in defendant's Answer. Defendant did not pay the penalty and, on November 28, 1990 the Commission filed suit in this court to enforce the Order.

## II. STANDARD OF REVIEW

Section 31 of the Federal Power Act, 16 U.S.C. § 823b(3)(B) specifies that when FERC brings an action in district court to enforce a civil penalty assessment, the court must make a _de_ _novo_ review of the assessment. Accordingly I will give no deference to FERC's decision. Instead, I will make "a fresh, independent determination of 'the matter' at stake." Doe v. United States, 821 F.2d 694, 697-98 (D.C. Cir. 1987).

In considering the cross motions for summary judgment, I must bear in mind that summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine" issue is one "that properly can be

9

resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); accord Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990). A "material issue" is one that "affect[s] the outcome of the suit . . . ." Anderson, 477 U.S. at 248. The burden is upon the moving party to aver the lack of a genuine, material factual issue, Finn v. Consolidated Rail Corp., 782 F.2d 13, 15 (1st Cir. 1986), and the court must view the record in the light most favorable to the non-movant, according the non-movant all beneficial inferences discernable from the evidence. Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988). If a motion for summary judgment is properly supported, the burden shifts to the non-movant to show that a genuine issue exists. Donovan v. Agnew, 712 F.2d 1509, 1516 (1st Cir. 1983).

## III. DISCUSSION

FERC based its civil penalty assessment on its conclusions that the defendant violated various articles in his license when he: (1) completed construction of the penstock in 1987; (2) constructed a concrete slab on the left bank of the river in 1988; and (3) built a temporary gravel berm in the river to

10

divert water from the work area where the concrete slab was to be constructed. I evaluate these conclusions by assessing the applicability of each license condition the defendant allegedly violated to the project's three main areas of construction activity. I then address defendant's claim that FERC is equitably estopped from assessing a civil penalty against him.

A. Article 4

Article 4 of the defendant's FERC license states that:

The construction, operation, and maintenance of the project and any work incidental to additions or alterations shall be subject to the inspection and supervision of the Regional Engineer, Federal Power Commission, in the region wherein the project is located, or of such other officer or agent as the Commission may designate, who shall be the authorized representative of the Commission for such purposes. The Licensee shall cooperate fully with said representative and shall furnish him a detailed program of inspection by the Licensee that will provide for an adequate and qualified inspection force for construction of the project and for any subsequent alterations to the project. Construction of the project works or any feature or alteration thereof shall not be initiated until the program of inspection for the project works or any such feature thereof has been approved by said representative. The Licensee shall also furnish to said representative such further information as he may require concerning the construction, operation, and maintenance of the project, and of any alteration thereof and shall notify him of the date upon which work will begin, as far in advance thereof as said representative may reasonable specify, and shall notify him promptly in writing of any suspension os work for a period of more than one week, and of its resumption and completion. . . .

11

## 1. **The Penstock**

The parties agree that defendant completed installation of the penstock by placing lengths of pipe in the power canal next to the gatehouse and under the railroad trestle between approximately October 28 and December 15, 1987. FERC alleges that defendant violated Article 4 when he completed the penstock because he "(a) never submit[ted] a construction quality control program of inspection for project construction; (b) commence[d] construction without an approved quality control program; and (c) fail[ed] to notify the director of the date upon which work began during November and December 1987." 52 FERC ¶ 62.289 (1990). Defendant argues that he was not obligated to comply with Article 4 because: (1) the penstock work did not qualify as "construction" within the meaning of Article 4; and (2) even if the penstock work could be characterized as "construction," it was "initiated" before he obtained the license.

Defendant's arguments do not require extended analysis. "Construct" means to "make by fitting parts together; build, form . . ." and "construction" is defined as "the act or mode of constructing." The Concise Oxford Dictionary of English, Clarendon Press, (1990) at 246. Under this definition, the

12

penstock work plainly qualifies as "construction of the project works or any feature or alteration thereof."  Since defendant has failed to identify any plausible alternative definition that serves his interests, I reject his claim that the penstock work did not qualify as "construction."

Defendant's second argument fares no better.  If the term "initiated" is construed without reference to the rest of Article 4, the defendant's argument has a certain plausibility.  Since defendant began to build the penstock before he obtained the license, it could be said in a very narrow sense that he did not "initiate" construction when he completed the penstock in 1987.  However, defendant's reading of the term makes no sense when it is construed in context.  The manifest purpose of Article 4 is to insure that FERC is provided with a satisfactory inspection program for any significant construction that is to be  performed on a licensed hydroelectric project.  This purpose would be completely frustrated if a licensee could avoid the requirements of Article 4 merely by starting construction on some aspect of a project before obtaining a license.  Thus, I construe "initiated" in accordance with its only reasonable contextual meaning and hold that defendant was obligated to comply with Article 4 before engaging in any "construction" that was not already subject to an

13

approved inspection program.

2. **The Concrete Slab**

The parties agree that the defendant placed a concrete slab in areas he excavated along the left bank of the river, leaving a cavity in the slab for future installation of a draft tube. Defendant disputes FERC's contention that he was obligated to comply with Article 4 before embarking on this work because he claims that the work should be considered "repair" or "maintenance" work rather than "construction." See, e.g., Puget Sound Power & Light Co.v. Federal Power Comm'n, 557 F.2d 1311, 1314 (9th Cir. 1977) (holding in a different context that restoration of project's flume and generating units qualified as "repair" work rather than "construction").

I reject defendant's arguments for two reasons. First, construction activities are not exempt from Article 4's requirements merely because such activities might fairly be characterized as "repair" or "maintenance" work. Article 4 does not expressly exempt "repair" or "maintenance" work. Nor do I find anything in the Article's text suggesting that such an exemption exists by implication. Thus, I conclude that Article 4 applies to "construction of the project works or any feature or

14

alteration thereof," even if such work might also be characterized as "repair" or "maintenance" work.

Second, the record does not support defendant's claim that his work on the concrete slab can be fairly characterized as either "maintenance" or "repair" work. The defendant substantially excavated the left bank of the river and built an entirely new structure when he constructed the concrete slab. This kind of substantial change in a project cannot qualify as either "maintenance" or "repair work." See, e.g., Aquenergy Systems, Inc. v. FERC, 857 F.2d 227, 229 (4th Cir. 1988) (dictum) (substantial changes to existing project are not "repairs").[3]

B. Article 302

Article 302 of defendant's FERC license states that:

> The licensee shall at least 60 days prior to start of construction, submit one copy to the Commission's Regional Director and two copies to the Director, Division of Inspections, of the final contract drawings and specifications for pertinent features of the project, such as water retention structures, powerhouse, and water conveyance structures. . . .

―――――――――――――

[3]Defendant claims that FERC characterized similar work he performed in 1990 as "repair" work. The record, however, does not support his claim. Defendant's proposal for the 1990 work that FERC characterized as "repair" work involved repairs to an existing structure. This characterization provides no support for defendant's contention that the construction of an entirely new structure also qualifies as a "repair" or "maintenance."

15

## 1. **The Penstock**

It is undisputed that the defendant did not submit copies of final construction drawings and/or specifications to FERC at least 60 days before he began work on the penstock in 1987. As a result, FERC contends that defendant violated Article 302. Defendant maintains that FERC's approval of the plans he submitted when he applied for the license was sufficient to meet the requirements of Article 302.[4]

Defendant submitted "Exhibit F" drawings which consisted of blueprints and drawings of information about the project, including the penstock, when he applied for a license in 1985. These drawings conformed to the Commission's regulation defining the necessary contents of a license application which states:

> (e) Exhibit F consists of general drawings of the principal project works. The drawings need not conform to the specifications of § 4.39. The exhibit must conform to the following requirements:
> (1) The exhibit must consist of ink drawings, or

---

[4]Defendant also argues that he started construction of the penstock before he obtained the license. He, therefore, argues that he was under no obligation to comply with Article 302 when he resumed construction after he obtained the license. I reject this argument for the same reason that I reject defendant's claim that he "initiated" construction of the penstock under Article 4 before he obtained the license.

drawings of similar quality, on sheets no smaller than 8 and one-half inches by 11 inches, drawn to a scale no smaller than 1 inch equals 50 feet for plans, elevations, and profiles, and 1 inch equals 10 feet for sections.  After initial review of the application, an original and 2 copies of any drawing must be submitted on 35mm microfilm, if requested by Commission staff.

(2) The drawings must show a plan, elevation, profile, and section of the dam structure and powerplant. Generating and auxiliary equipment proposed must be clearly and simply depicted and described.  A north arrow must be included on the plan view.

18 C.F.R. 4.61.  FERC has submitted uncontradicted testimony that Exhibit F drawings are simple, general depictions of various aspects of the project.  It has also established that defendant's Exhibit F drawings do not contain specific information like the method of installing the penstock pipe, the method of joining the penstock, where the penstock pipe would be installed, if and what type of drainage system would be provided, testing procedures, and amounts of pressure to which the pipe would be subjected.  As such, FERC was unable to assess the adequacy and safety of the proposed penstock work from the Exhibit F drawings.  In response, FERC did two things to ensure that it would be provided adequate information to assess defendant's work.  First, it included Article 302 in the defendant's license.  Second, it sent him a follow-up letter in November, 1987, directing his attention to Articles 4, 301, 302, and 303.  Both steps came well after

17

defendant submitted Exhibit F with his license application. Because Exhibit F drawings are only intended to be preliminary drawings, and because defendant was notified several times that he was required to submit final construction drawings, I reject defendant's argument that the Exhibit F drawings he submitted were adequate to satisfy Article 302.

## 2. **The Concrete Slab**

Defendant argues that he was not obligated to comply with Article 302 when he constructed the concrete slab by again contending that his work on the slab qualified as "maintenance" or "repair" work rather than "construction." I reject this argument here for the same reasons that I rejected it when defendant sought to apply it to Article 4.

Defendant also argues that the term "prior to the start of construction" refers to construction of the project. Thus, he argues that because he obtained his license after he started construction on the project, he did not violate Article 302 when he completed the penstock and built the concrete slab without first submitting final construction drawings for this work.

The purpose of Article 302 is to give FERC the opportunity to approve final construction drawings for work on licensed

18

projects that will take place after the license is issued. Reading Article 302 as defendant proposes would deprive the article of any meaning. In contrast, reading Article 302 to require the defendant to submit final construction drawings for any construction of "pertinent features of the project" that will occur after the license issues achieves the Article's purpose. Accordingly, I reject defendant's narrow interpretation of the phrase "start of construction" and determine that defendant violated Article 302 by not submitting final construction drawings for the penstock work and the concrete slab before commencing this work.

    C.  The Berm

    The parties agree that defendant built a temporary berm to divert water from the excavation area on the river's left bank. The berm consisted of rocks and gravel excavated from the river bed, about 20-25 feet wide at its base, approximately 60 feet long, with an average height of 4-6 feet. FERC argues that this structure was a "cofferdam" and, therefore, defendant was obligated to comply with Article 303.[5] Article 303 states that:

_____

    [5]FERC also contends that defendant failed to file an emergency action plan under 18 C.F.R. § 12.23(a). However, this regulation only applies to "unconstructed projects." The regulations define constructed projects as "any project with an

19

The licensee shall review and approve the design of contractor-designed cofferdams and deep excavations prior to the start of construction and shall ensure that construction of cofferdams and deep excavations is consistent with the approved design. At least 30 days prior to the start of construction of the cofferdam, the licensee shall submit to the Commission's Regional Director and Director, Division of Inspections, one copy each of the approved cofferdam construction drawings and specifications and the letter(s) of approval.

FERC alleges that defendant violated Article 303 because he failed to: (1) review and approve the cofferdam's design; (2) ensure that the cofferdam was constructed in accordance with the approved design; and (3) submit construction drawings and specifications to FERC prior to the start of construction. Defendant contends that the structure he created was not a cofferdam because it did not create an impoundment of water. Once again, I disagree.

Although FERC regulations do not provide a definition of "cofferdam," the term is commonly defined as "a water tight enclosure pumped tight to permit work below the water line on buildings bridges etc. . . ." Concise Oxford Dictionary of English, Clarendon Press, 1990. The berm at issue here was

---

existing dam." 18 C.F.R. § 12.3(b)(5). Since it is undisputed that defendant's project qualified as a constructed project under this definition, it cannot be subject to regulations that apply only to unconstructed projects. Accordingly, I reject FERC's argument on this point.

20

intended to be a temporary structure that would keep water from the river from entering the excavation area. Moreover, its purpose was to keep the river water out of the excavation area so that the concrete slab could be built. Thus, the berm plainly qualifies as a cofferdam.

Defendant also argues that he was not obligated to comply with Article 303 because the berm was not "contractor-designed." Although defendant concedes that his contractor conceived, planned and constructed the berm, he argues that it was not "contractor-designed" because the contractor did not prepare construction drawings. I reject this argument because it reads a requirement into Article 303 that it does not contain. It is not necessary to prepare drawings or plans in order to "design" something. Moreover, the narrow construction of "design" the defendant proposes would frustrate Article 303's purpose, which is to allow FERC to insure the safety of workers who must work in areas protected by cofferdams.

D. <u>Estoppel</u>

Defendant's final argument is that FERC should be estopped from seeking a civil penalty because it sent him a letter stating in pertinent part:

Your attention is directed to special articles nos.

21

301, 302 and 303. Some of the articles involve tasks that must be accomplished before or during construction of the project. We are monitoring your compliance with these articles, and will not permit the project to become operational until this work is satisfactorily completed.

On its face, this letter represented only that FERC intended to monitor and enforce certain conditions in defendant's license. Defendant reads into the letter an additional promise that "if FERC disagreed with his interpretation of the articles, it would inform him as a result of its monitoring process." Defendant bases his equitable estoppel claim on FERC's alleged failure to fulfill this implied promise.

In order to establish an equitable estoppel claim, a party must show: (1) a misrepresentation; (2) reasonable reliance on the misrepresentation; and (3) damages. Falcone v. Pierce, 864 F.2d 226, 228 (1st Cir. 1988). When a party seeks to estop the government from enforcing the law, these standards are arguably even more stringent. Heckler v. Community Health Services Inc., 467 U.S. 51, 60 (1984) (declining to adopt a rule that estoppel does not run against the government but observing that "it is well settled that the Government may not be estopped on the same terms as any other litigant").

In the present case, defendant's estoppel argument fails for

22

the simple reason that FERC never made the promise defendant claims it made. Even judged by the liberal standard of review I must employ on a motion for summary judgment, defendant simply makes too much of FERC's letter. Thus, I conclude that if the defendant relied on an alleged promise by FERC to inform him of his license violations, that reliance was unreasonable as a matter of law.

    E.   <u>The Penalty</u>

In determining the amount of any civil penalty that should be assessed for a violation of the terms of a FERC license, I must consider "the nature and seriousness of the violation, failure or refusal and the efforts of the licensee to remedy the violation, failure or refusal in a timely manner." 16 U.S.C. § 823 (b)(C) (describing standards FERC must consider in assessing a civil penalty). I am unable to determine the amount of the penalty on the present record because genuine disputes exist as to facts that are material to my determination of the amount of the penalty.


## IV. <u>CONCLUSION</u>

For the reasons stated herein, I award partial summary judgment to FERC with respect to its claims that (1) defendant

23

violated Article 4 in connection with the construction of the penstock in 1987 and the concrete slab in 1988; (2) defendant violated Article 302 in connection with the construction of the penstock in 1987 and the concrete slab in 1988; (3) defendant violated Article 303 in connection with the construction of the gravel berm in 1988. I award partial summary judgment to the defendant with respect to his claim that he did not violate 12 C.F.R. § 12.23(a) in connection with the construction of the gravel berm. I deny FERC's claim for summary judgment as to the amount of the civil penalty.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March 30, 1994

cc:  Elaine Lacy, Esq.
     Demetra Anas, Esq.
     Daniel Allegretti, Esq.