USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ Nos. 93-1503 94-1752 THOMAS HODGSON & SONS, INC., Petitioner, v. FEDERAL ENERGY REGULATORY COMMISSION, Respondent. ____________________ ON PETITIONS FOR REVIEW OF ORDERS OF THE FEDERAL ENERGY REGULATORY COMMISSION ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ ____________________ Howard M. Moffett, with whom Orr & Reno, P.A. was on brief for __________________ _________________ petitioner. Joel M. Cockrell, Attorney, with whom Susan Tomasky, General _________________ ______________ Counsel, and Jerome M. Feit, Solicitor, Federal Energy Regulatory ________________ Commission, were on brief for respondent. ____________________ March 13, 1995 ____________________ BOWNES, Senior Circuit Judge. Petitioner, Thomas BOWNES, Senior Circuit Judge. ____________________ Hodgson and Sons, Inc. (Hodgson), appeals from a second order by respondent, the Federal Energy Regulatory Commission (FERC), denying Hodgson a rehearing, and from FERC's finding that the operation of Hodgson's China Mill hydroelectric plant (China Mill) came under the licensing jurisdiction of Section 23(b) of the Federal Power Act (FPA)21 pursuant to  ____________________ 1. Section 23(b) of the original Federal Power Act, ch. 285, 23(b), 41 Stat. 1075 (1920) has been amended and codified under 16 U.S.C. 817(1) (1988) ("Projects not affecting navigable waters; necessity for Federal license, permit or right-of-way"). It provides: Any person, association, corporation, State, or municipality intending to construct a dam or other project works across, along, over, or in any stream or part thereof, other than those defined in this chapter as navigable waters, and over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States shall before such construction file declaration of such intention with the Commission, whereupon the Commission shall cause immediate investigation of such proposed construction to be made, and if upon investigation it shall find that the interests of interstate or foreign commerce would be affected by such proposed construction, such person, association, corporation, State or municipality shall not construct, maintain, or operate such dam or other project works until it shall have applied for and shall have received a license under the provisions of this chapter. If the Commission shall not so find, and if no public lands or reservations are affected, permission is granted to construct such dam or other project works in such stream upon compliance with State -2- 2 FERC's "post-1935 construction" rule. FERC claims that for purposes of Section 23(b), shutting down a hydroelectric plant for twelve years after 1935 and powering it back up to its former specifications constitutes post-1935 construction without more. Hodgson, on the other hand, claims that operating China Mill after maintaining it over the years until its use became profitable, does not amount to such construction, and that even if it does, FERC's terms in the license were unreasonable. After reviewing the statute and pertinent case law, we conclude that FERC erred in its determination that it had jurisdiction over China Mill.  I. BACKGROUND I. BACKGROUND __________ The China Mill dam was constructed in the late 1860's as a grist mill in Merrimack County, New Hampshire, on the Suncook River, which is not navigable. The site included the dam, diversion canal, penstocks and turbine which were installed prior to 1900. China Mill was converted from hydromechanical to hydroelectric power before 1914. The petitioner has owned China Mill since 1970. Under a succession of owners, China Mill continuously produced electricity until 1969 in its present configuration. Power generation stopped for approximately twelve years starting in 1969. The parties dispute the  ____________________ laws. We shall follow the lead of the parties and refer to the statute as "Section 23(b)." -3- 3 nature of the stoppage. Petitioner alleges that a natural disaster initially led to the stoppage. Respondent asserts that the natural disaster was only a log that got caught in the project's machinery and that the true reason for the stoppage was purely economic. During the period of non- generation, the production of power was apparently uneconomical for China Mill. The cost of purchasing electricity was low, and no market existed for selling excess power. For reasons to be stated, the exact cause of the hiatus in the production of electricity does not affect FERC's jurisdiction. With the federal enactment of the Public Utility Regulatory Policies Act (PURPA)2 and New Hampshire's passage of the Limited Electrical Energy Producers Act (LEEPA),3 Hodgson decided that it would be again profitable to produce power at China Mill. In 1981 Hodgson started to generate power at China Mill and sold power to the Public Service Company of New Hampshire. In September of 1989 FERC directed Hodgson to show why China Mill should not be licensed under the FPA. At first, Hodgson did not object to obtaining a license and in fact voluntarily applied for one in March, 1990.  ____________________ 2. 16 U.S.C. 824 et seq. __ ___ 3. N.H. Rev. Stat. Ann. 362-A:3. -4- 4 Hodgson's spirit of cooperation was short lived. In July, 1992, FERC issued Hodgson a license with conditions that included, inter alia, a minimum water flow of fifty _____ ____ cubic feet per second (cfs), an historic resource management plan, and aesthetic improvements to the mill building. Thomas Hodgson and Sons, Inc., 60 F.E.R.C. 62,071 (1992) ______________________________ (Hodgson I). Hodgson objected to these conditions, __________ especially challenging the fifty cfs requirement which it claims would result in an annual loss of over $68,000. Unhappy with the terms of its license, Hodgson withdrew its application4 and sought a rehearing contesting both FERC's jurisdiction and the terms of the license. Thomas Hodgson & Sons, Inc., 63 F.E.R.C. 61,068 (1993) _____________________________ (Hodgson II). Among its reasons for denying the rehearing, __________ FERC stated that the generating capacity of China Mill had been increased, but that even if the capacity remained the same, the project had been abandoned and, therefore, the renewed operation constituted post-1935 construction. Id. at ___ 61,293. Its determinative findings were as follows: Hodgson does not dispute that the Suncook River, a tributary of the Merrimack River, is a Commerce Clause water, or that the project affects interstate commerce due to its interconnection with the interstate  ____________________ 4. Hodgson claims it has the right to withdraw a voluntary license application. FERC does not dispute this; so we do not address it. -5- 5 electric grid. However, Hodgson disputes that the development has undergone post- 1935 construction. As noted above, the project's generating capacity from 1934 through 1939 was 1,300 kW, but some time between 1939 and 1942 the generating capacity was increased to 1,500 kW. The installation after 1935 of additional generating capacity constitutes post-1935 construction. Even if the installed capacity of the project were unchanged after 1935, the project would still be required to be licensed. Ordinary maintenance, repair, and reconstruction activity with respect to a project constructed before 1935 does not constitute post-1935 construction for purposes of Section 23(b)(1). However, the pre-1935 construction exception protects only operating projects. Where a project has been abandoned, there is no basis for a claim that the operator retains operating rights, even if the operator, after 1935, restores the project to a condition identical to its pre-abandonment status. As noted above, ________________ the China Mill Project was abandoned in _________________________________________ the 1960s and was not operated again _________________________________________ until 1981. Consequently, the renewed _________________________________________ operation constituted post-1935 _________________________________________ construction. In light of all of the _____________ above, we affirm the Director's finding that the project is required to be licensed. Id. (emphasis added; footnotes omitted). A second petition ___ for rehearing followed. During this time, Hodgson, asserting its right to decline the license, petitioned this court for a stay and review of the terms of the license. We determined that Hodgson did not accept the license but declined to stay or -6- 6 further review the order until FERC considered Hodgson's second petition for rehearing. Hodgson v. F.E.R.C., No. 93- _______ ________ 1503 (1st Cir. May 14, 1993) (order denying stay of license terms). In the second petition for rehearing, Thomas ______ Hodgson & Sons, Inc., 67 F.E.R.C. 61,202 (1994) (Hodgson _____________________ _______ III), FERC again addressed the challenge to its jurisdiction. ___ We set forth FERC's pertinent findings: Construction activity in the maintenance and repair of existing, continuously operating projects does not constitute post-1935 construction within the meaning of the FPA, so long as the construction activity does not result in such things as the enlargement of generating capacity or of the physical plant. However, construction activity such as the construction or enlargement of a dam or other project works, including the enlargement of generating capacity, constitutes post-1935 construction. . . . . . . . [T]he installation of a new generator at the China Mill Project, of itself, did not result in an increase in generating capacity at the project. Id. at 61,632-33 (footnotes omitted). ___ However, if a hydroelectric project has been taken out of service for a number of years, then the restoration of generation at the project is the equivalent of post-1935 construction, even if the project has not been enlarged, and irrespective of how much or little reconstruction or refurbishment was involved. -7- 7 Id. at 61,633 (footnote omitted). ___ In determining whether abandonment has occurred for purposes of section 23(b)(1), the question is not . . . whether the site has been literally abandoned and left to fall into a state of disrepair. Nor is the amount of repair or reconstruction work needed to put the project back into operation relevant. Rather, abandonment for FPA purposes means that the hydroelectric generating function of the project has been abandoned. Id. (footnote omitted). ___ The new business here is Hodgson's commencement of hydroelectric generation in 1981. We therefore affirm our finding that the China Mill Project is required to be licensed pursuant to section 23(b)(1) of the FPA. Id. at 61,634 (footnote omitted). This appeal followed. ___ We have jurisdiction pursuant to 16 U.S.C. 825l(b) which allows a party "aggrieved by an order issued by _ the Commission . . . [to] obtain a review of such order in the United States court of appeals for any circuit wherein the licensee . . . is located." In its petition, Hodgson challenges FERC's jurisdiction and, in the alternative, asks us to review the propriety of the requirements of the license which it claims are unreasonable. Finding that FERC did not have jurisdiction, we do not reach the merits of the license requirements. II. STANDARD OF REVIEW II. STANDARD OF REVIEW __________________ -8- 8 We review FERC's findings of fact for "substantial evidence," and if so supported, such findings are conclusive. Northeast Utils. Serv. Co. v. F.E.R.C., 993 F.2d 937, 944 ___________________________ ________ (1st Cir. 1993). On the other hand, "[p]ure legal errors require no deference to agency expertise, and are reviewed de __ novo." Id.; see also Boston Edison Co. v. F.E.R.C., 856 F.2d ____ ___ ___ ____ _________________ ________ 361, 363 (1st Cir. 1988). FERC asserts that this court owes deference to its finding of jurisdiction under Chevron U.S.A., Inc. v. Natural ____________________ _______ Resources Defense Council, Inc., 467 U.S. 837 (1984). __________________________________ Chevron held:  _______ When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. Id. at 866. FERC misplaces its reliance on Chevron for two ___ _______ reasons. First, in Chevron, the Supreme Court addressed the _______ issue of whether the Environmental Protection Agency based a policy on a reasonable construction of the Clean Air Act. Id. at 840. But here, FERC did not base its order on an ___ interpretation of the FPA, but rather on its reading of judicial precedent. Chevron and its progeny mandate _______ deference "when a court is reviewing an agency decision based on a statutory interpretation." National R.R. Passenger _________________________ Corp. v. Boston & Me. Corp., 112 S. Ct. 1394, 1401 (1992). _____ __________________ -9- 9 Because FERC did not base its jurisdiction on an interpretation of the statute but looked to case law, we owe its finding of jurisdiction no more deference than we would any lower court's analysis of law. Second, deference to agency interpretations does not give an agency the final word on statutory meaning. "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." Chevron, _______ 467 U.S. at 843 n.9 (citations omitted). The Supreme Court thus set out the rule: If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect. Id.  ___ III. ANALYSIS III. ANALYSIS ________ Jurisdiction Under the FPA Jurisdiction Under the FPA __________________________ The FPA provides FERC with broad but not ubiquitous power over hydroelectric facilities. Originally, Section 23 of the FPA only provided that persons intending to construct projects5 on nonnavigable waters6 could file a declaration  ____________________ 5. By "project" the FPA "means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures . . . ." See 16 U.S.C 796(11). ___ -10- 10 of intent at their discretion. Farmington River Power Co. v. __________________________ Federal Power Comm'n, 455 F.2d 86, 88 (2d Cir. 1972). The _____________________ Federal Power Commission (FPC), FERC's predecessor, could then require a license before any construction continued. Id. If a person intending to construct a project on ___ nonnavigable waters did not file a declaration, the FPC had no power to require a license. Id. at 89.  ___ Congress amended the FPA in 1935, expanding the FPC's licensing jurisdiction to require that persons "intending to construct a dam or other project works"7 on ______________________ nonnavigable streams obtain a license. 16 U.S.C. 817(1) (emphasis added). "These words quite clearly indicate a prospective view." Farmington River Power Co., 455 F.2d at __________________________ 90; Aquenergy Systs., Inc. v. F.E.R.C., 857 F.2d 227, 229 _______________________ ________ (4th Cir. 1988) (same); see also Puget Sound Power & Light ___ ____ __________________________ Co. v. Federal Power Comm'n, 557 F.2d 1311, 1315 (9th Cir. ___ ____________________ 1977) ("the statute is to apply only to projects begun after _____ the effective date in 1935"). It is the post-1935 construction of a project that triggers the licensing jurisdiction of Section 23(b).  ____________________ 6. The FPA does not define "nonnavigable waters" but "navigable waters," inter alia, "means those parts of . . . _____ ____ bodies of water over which Congress has jurisdiction under its authority to regulate commerce." See 16 U.S.C 796(8). ___ 7. By "project works" the FPA "means the physical structures of a project." 16 U.S.C. 796(12). -11- 11 All construction after 1935, however, does not translate into jurisdictional construction under the FPA merely because it post-dates the act. Supplemental building after 1935 generally is not post-1935 construction if the work only maintains or restores a project to its former specifications. Puget Sound, 557 F.2d at 1315. Nor do ____________ "repairs - even those of substantial nature - . . . confer jurisdiction over an otherwise exempt facility." Id. at ___ 1316. An exception to this rule arises where a project has been abandoned. After the complete abandonment of a project, an owner no longer retains pre-1935 operating rights. Aquenergy, 857 F.2d at 230. In Aquenergy, the court _________ _________ determined that such abandonment occurred after more than thirty years of disuse and neglect which resulted in the project works being reduced to ruin. Id. at 229. Because ___ the owner in Aquenergy abandoned the project, it no longer _________ retained its pre-1935 operating rights. Id. at 230. ___ Although Aquenergy creates an exception to Puget Sound, the _________ ___________ court emphasized the lack of licensing jurisdiction under Section 23(b) for repairs and reconstruction without a finding of abandonment. Citing the general rule for Section 23(b) the court stated, "[a] project is not brought within the Commission's jurisdiction if work done in the name of -12- 12 repair does not so alter the project that it is no longer what was there before 1935." Aquenergy, 857 F.2d at 229. _________ Both Hodgson and FERC rely on Puget Sound and ___________ Aquenergy. The parties do not argue that either case is in _________ error; rather, they urge that either case controls in the alternative. We, however, read Aquenergy to be an exception _________ to Puget Sound rather than an independent rule. The holding ___________ in Aquenergy makes this clear:  _________ Aquenergy puts great reliance upon Puget Sound, but it does not help them, ___________ for we take no issue with the proposition that the magnitude of the work is not controlling or even relevant. The relative magnitude of the work in Puget _____ Sound may have been comparable to that _____ involved here, but the owner had never abandoned the project. It had moved rather promptly to put the project back into partial operation and in full operation when demand for its output justified it. In great contrast, here, J.P Stevens simply abandoned the project. The entire thing was closed down. The turbine was apparently removed, but the rest was left for deterioration to take its toll and nature to heal her wounds. After such complete abandonment over a period of more than 30 years, there is no basis for a claim that the owner retained operating rights. The statute was designed to keep in operation projects existing in 1935, but not to restore abandoned rights. 857 F.2d at 230. Accordingly, unless the abandonment exception applies, FERC has no jurisdiction over China Mill. In Hodgson II and III, FERC ruled that the ___________ ___ abandonment of power production alone and without -13- 13 construction or physical abandonment gave it jurisdiction under Section 23(a) of the FPA when a project resumed power production. FERC stated its jurisdictional rationale as follows: In determining whether abandonment has occurred for purposes of section 23(b)(1), the question is not . . . whether the site has been literally abandoned and left to fall into a state of disrepair. Nor is the amount of repair or reconstruction work needed to put the project back into operation relevant. Rather, abandonment for FPA ____________________ purposes means that the hydroelectric _________________________________________ generating function of the project has _________________________________________ been abandoned. ______________ Hodgson III, 67 F.E.R.C. at 61,633 (emphasis added; footnote ___________ omitted). We disagree for the following reasons. First, FERC completely misunderstands the relevance of work to a finding of post-1935 construction. Aquenergy _________ does state, "the magnitude of the work is not controlling," _________ 857 F.2d at 229 (emphasis added), but at no time does the court there espouse the notion that the existence of work _________ itself is unnecessary for jurisdiction. To the contrary the court states: One must look to the nature of the work and the purpose of the owner. Major repairs may involve much construction activity, but the project is not brought within the Commissions's jurisdiction if work done in the name of repair does not so alter the project that it is no longer what was there before 1935. Id. ___ -14- 14 Second, FERC's order underestimates the importance of the physical act needed to support a finding of abandonment. The heart of the error in Hodgson II and ___________ Hodgson III is that there was in fact no abandonment as that ___________ word is generally understood. Abandonment is a question wholly separate from the statutory language of the FPA. In no place does the FPA define or refer to the term "abandon" or "abandonment." Aquenergy goes to great pains to stress _________ the physical abandonment that occurred in that case. As the court observed, "there was no activity at the project, not even minimal maintenance"; "[t]he powerhouse . . . disintegrated or was torn down"; "trees had reestablished themselves"; and "nothing was done during those 30 years to impede nature's reclamation of what had been her own." 857 F.2d at 229. Additionally, in its two and one-half page opinion the court in Aquenergy notes the period of the _________ abandonment, "30 years," at least seven times, thus stressing the importance of physical desertion as a factor in abandonment. See id. at 229-30.  ___ ___ The facts show that China Mill was not "abandoned" in the Aquenergy sense. Workers performed general cleaning _________ and maintenance during the shutdown period, and the project required only minimal work to restart. Moreover, China Mill still operated in some manner during the shutdown. Although not producing its own power, China Mill was used to control -15- 15 and monitor external power to the factory through its generator control panel, and workers checked that panel monthly.8 FERC does not assert that these or any activities constituted construction, and even if they did, we believe that they show the project was not abandoned within the meaning of Aquenergy. We believe the facts here are _________ analogous to those of Puget Sound, which we find controlling. ___________ In Puget Sound, a landslide destroyed a pre-1935 project, and ___________ when the owner commenced the extensive work to reconstruct the project, the FPC claimed it needed a license. 557 F.2d at 1312. The court disagreed and found that reconstruction did not give the FPC jurisdiction. It found that, because the repairs "merely restored the [project] to its original specifications and configuration," "[t]here was no new 'construction'." Id. at 1316. Even though five years passed ___  ____________________ 8. Hodgson III stated: ___________ Hodgson submitted the affidavits of three men who worked at China Mill at various times during the 1960's, 1970's, and early 1980's. According to the affidavits, mud and silt were removed from the power canal; the penstocks, turbines, and draft tubes were inspected annually; the gates at the upper and lower end of the power canal were checked and cleaned annually; and the generator control panel was checked at least monthly because it controlled the voltage coming into the manufacturing mill from the transmission lines of Public Service Company of New Hampshire. 67 F.E.R.C. at 61,633 n.11. -16- 16 before the defendant repaired and put into service two of the four preexisting generators, the court found no jurisdiction under the FPA. Id. at 1313. The court held that repair and ___ maintenance construction on even a large scale do not amount to post-1935 construction if the scope of the work remains within the original specification of the project. Id. at ___ 1315. Puget Sound applies directly here. There was "[n]o ___________ project enlargement . . . in capacity, diversion, or physical plant," no reconfiguration since 1935 of "[t]he original sites for the power house, the dam and the flume," and no change in the electrical generating capacity since 1935. Id. ___ at 1316. There was, therefore, just as here, no post-1935 construction, and so no jurisdiction in FERC. We have reviewed FERC's own cases addressing post- 1935 construction, none of which were subject to appellate review, and they do not lend support to FERC's claim of jurisdiction. The cases either contradict FERC's current position, contradict each other or err for the same reasons we have stated. See McRay Energy Inc., 57 F.E.R.C. 61,061 ___ _________________ (1991) (no jurisdiction over project after six-year period of "abandonment" and reinstallation of same generator and minimal repairs to return to service because actual construction is an essential element of Section 23(b) jurisdiction); Yankee Hydro Corp., 52 F.E.R.C. 61,074 ____________________ -17- 17 (1990) (ten-year cessation of generation at flooded project where same generator was removed and later replaced was abandonment and required a license); Theodore A. and Holly S. ________________________ Keck, 51 F.E.R.C. 61,018 (1990) (after owners installed ____ generator of greater capacity, abandonment of project incurred Section 23(b) jurisdiction); North American Hydro, ______________________ Inc., 46 F.E.R.C. 62,175 (1989) (project brought back to ____ original capacity after it was unused for fifteen years required license where owner surrendered the license and dismantled the facility); Pacific Power & Light Co., 10 ____________________________ F.E.R.C. 62,209 (1980) (no post-1935 construction despite replacement of wooden diversion structure with concrete structure because Section 23(b) jurisdiction requires that "construction must increase the project's . . . generating capacity . . . or otherwise significantly modify the project's pre-1935 design or operation").9 We point out that the one case cited in FERC's brief as being contrary to circuit precedent contains, in our view, a correct assessment of the commission's jurisdiction. In McRay Energy Inc., 57 F.E.R.C. 61,061, FERC recognized __________________ that the resumption of power production at a pre-1935 project  ____________________ 9. Only one of FERC's recent Section 23(b) cases faced appellate review, but that order was based and affirmed on other grounds. In Habersham Mills v. F.E.R.C., 976 F.2d 1381 _______________ ________ (11th Cir. 1992), the Eleventh Circuit did not address post- 1935 construction because the petitioner only questioned FERC's determination that the project affected interstate commerce. -18- 18 did not give rise to Section 23(b) jurisdiction absent actual physical construction. In reaching its holding FERC accurately noted, "actual construction or reconstruction of facilities is an essential element of the 'post-1935 construction' prong of section 23(b) jurisdiction, even when the project has been abandoned and restarted after 1935." Id. at 61,234. At China Mill not only was there no ___ abandonment, there was no finding of any construction by FERC. IV. CONCLUSION IV. CONCLUSION __________ The order of FERC assuming jurisdiction over China Mill is reversed with directions to dismiss the license application. Costs awarded to petitioner. Concurrence follows. Concurrence follows. -19- 19 CYR, Circuit Judge (concurring). As the CYR, Circuit Judge (concurring). ______________ fallacy in relying on Puget Sound and Aquenergy for FERC's ___________ _________ misinterpretation of the statutory term "[post-1935] con- struction" is plainly exposed in the majority opinion, it is neither necessary nor provident for the panel to embrace these decisions as First Circuit precedent, see supra at p. ___ _____ 16 ("[W]e find [Puget Sound] controlling."), in the context ___________ of this case. The issue on appeal is straightforward: whether the plain language of FPA 23(b) requiring FERC licensure of a "grandfathered" facility only in the event there has been "[post-1935] construct[ion]" encompasses circumstances in which no such construction has occurred, and __ ____ ____________ ___ ________ the owner merely reopens intact physical structures following a period of closure? If, as I respectfully submit, this question clearly must be answered in the negative, FERC's plea for Chevron deference is precluded, see Estey v. Commis- _______ ___ _____ _______ sioner of Maine Dep't of Human Servs., 21 F.3d 1198, 1201 _______________________________________ (1st Cir. 1994), and the court ought not venture further. The majority opinion accedes to FERC's invita- tion to extend its licensure authority based on the reasoning in Puget Sound and Aquenergy. In Puget Sound, however, the ___________ _________ ___________ putative licensee unquestionably had "constructed" physical structures anew at the "grandfathered" power facility follow- ing a devastating natural disaster. Based on its unexplained 19 assumption that Congress could not have intended to divest innocent owners of their "grandfathered" power-plant operat- ing rights merely for restoring to its original configuration a facility damaged in a natural disaster, the Ninth Circuit resorted to an equitable exception in interpreting the plain language of the FPA as precluding the agency's licensure jurisdiction. See Puget Sound Power & Light Co., 557 F.2d at ___ _____________________________ 1315. The Ninth Circuit panel pointed to no statutory lan- guage or legislative history remotely supportive of its strained interpretation of the statutory term "construct." See id. (merely noting, without citation to legislative ___ ___ history, "[w]e think Congress intended no such result"). As if to illustrate the maxim that hard cases beget bad law, the Fourth Circuit later extended the error propounded in Puget Sound. See Aquenergy Systs., 857 F.2d at ___________ ___ ________________ 227. Aquenergy Systems' actions clearly came under FERC _______ jurisdiction for the simple reason that it had "constructed" anew, from the ground up, disintegrated structures (including an entire powerhouse) following a voluntary closure of the facility lasting thirty years. Eschewing this plain language approach, the Aquenergy court attempted to accommodate the _________ Puget Sound rationale by engaging in an "abandonment" analy- ___________ sis which overlooked the fact that the FPA contains not one ___ ___ word suggesting that Congress intended FERC licensure to turn ____ on the licensee's (or predecessor's) "abandonment" of "grand- -20- 20 fathered" pre-1935 "operating rights." Id. at 230 (merely ___ concluding, without citation to legislative history, that "[t]he [FPA] was designed to keep in operation projects existing in 1935, but not to restore abandoned rights"). Quite the contrary, FPA 23(b) focuses unambiguously and _____________ exclusively on a specific event the "construction" of ___________ physical structures at the "grandfathered" generating site.  ________ __________ Although I wholeheartedly concur in the result reached by the court in the instant case, I cannot endorse its gratuitous adoption of the fallacious position advocated by FERC, that Aquenergy and Puget Sound are "controlling." _________ ___________ Although those decisions apparently control FERC in the Fourth and Ninth Circuits, respectively, neither FERC nor the majority opinion suggests a sound reason for reaching out in obiter dicta to embrace the problematic FPA interpretations ______ _____ propounded in Puget Sound and Aquenergy. Indeed, it is ___________ _________ particularly ironic that we should strain to embrace them even though FERC itself has not seen fit to do so. See McRay ___ _____ Energy, Inc., 57 F.E.R.C. 61,061 (1991) (no FERC jurisdic- ____________ tion over project even after six-year "abandonment," where facility reopened but no "construction" of facilities oc- curred). -21- 21