**UNITED STATES DEPARTMENT OF THE INTERIOR, Petitioner,**

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Boott Hydropower, Inc.; Eldred L. Field Hydroelectric Facility Trust, Intervenors.

No. 13-2439

United States Court of Appeals, First Circuit.

February 12, 2015

Robert J. Lundman, with whom Andrew C. Mergen, U.S. Department of Justice, Environment & Natural Resources Division, Robert G. Dreher, Acting Assistant Attorney General, Andrew Tittler and Jason Waanders, Office of the Solicitor, U.S. Department of the Interior, were on brief, for petitioner.

Carol J. Banta, with whom Robert M. Kennedy, Jr., David L. Morenoff, Acting General Counsel, and Robert H. Solomon, Solicitor, were on brief, for respondent.

Richard M. Lorenzo, with whom Loeb & Loeb, LLP, New York, NY, and Megan Beauregard, Associate General Counsel, Legal and Corporate Affairs, Enel Green Power North America, Inc., was on brief, for intervenors.

Wendy Jacobs and Aladdine Joroff, Emmett Environmental Law & Policy Clinic, Harvard Law School, on brief in support of petitioner, as amici curiae of the National Trust for Historic Preservation in the United States and Preservation Mass Inc.

Vincent C. Manzi, Jr. and Manzi Bonanno & Bowers, on brief in support of respondent, as amici curiae of the Lowell Motor Boat Club and The Greater Lawrence Community Boating Program.

Peter C.L. Roth, Senior Assistant Attorney General, N.H. Attorney General's Office, Environmental Protection Bureau, and Joseph A. Foster, Attorney General, on brief in support of respondent, as amicus curiae of the State of New Hampshire Fish & Game Department.

Before TORRUELLA, HOWARD, and KAYATTA, Circuit Judges.

TORRUELLA, Circuit Judge.

The United States Department of the Interior ("Interior") petitions this Court to review two orders of the Federal Energy Regulatory Commission ("FERC") which granted Boott Hydropower, Inc. and the Eldred L. Field Hydroelectric Facility Trust (collectively, "Boott") an amendment to their license for the Lowell Hydroelectric Project No. 2790. The amendment permitted Boott to replace the historic wooden flashboard system atop the Pawtucket Dam (the "Dam") in Lowell National Historic Park, Massachusetts, ("Lowell Park" or the "Park") with a modern pneumatic crest gate system. Interior alleges that replacing the flashboard system creates an adverse effect and is contrary to the standards established to protect the historical nature of Lowell Park, both of which are prohibited by the Lowell Act. For the reasons stated below, we disagree and deny Interior's petition for review.

## I. Background

In 1978, Congress passed the Lowell Act, Pub. L. No. 95-290, 92 Stat. 290 (1978) (codified at 16 U.S.C. §§ 410cc to 410cc-37 (1978)), which recognized that "certain sites and structures in Lowell, Massachusetts, historically and culturally the most significant planned industrial city in the United States, symbolize in physical form the Industrial Revolution." 16 U.S.C. § 410cc(a)(1). As such, it created Lowell Park and the Lowell Historic Preservation District. Id. § 410cc-11(a)(1). Located within the Park (which is itself located within the Preservation District) on the Merrimack River is the Dam.

The Dam was completed in 1830. In 1837, James Francis became the Dam's chief engineer and served in that role for forty years. Beginning in 1838, the Dam began using a system of flashboards. Flashboards are wooden planks, attached to the top of the Dam via metal pins drilled into the Dam's capstone, which are designed to "fail" under the pressure of high flows by bending over and falling out when the height of the river exceeds the flashboards, thus allowing the flows to safely pass over the crest of the Dam. By "failing," the flashboard system helps regulate water levels behind the Dam, control upstream flooding, and generate more power. Once the water levels recede to a certain level, workers manually replace the failed flashboards with new wooden planks; this cycle usually occurs four to five times per year. Throughout the history of the Dam, flashboards of various sizes have been used: two-foot boards from 1838-1883, three-foot boards from 1883 to 1896, and five-foot boards (in different configurations) from 1896 to the present.

In 1983, pursuant to its authority under the Federal Power Act, 16 U.S.C. § 797(e),

FERC issued a license to Boott to construct, operate, and maintain the Lowell Hydroelectric Project.[1] The project included the Dam. In 2007, FERC began receiving complaints from homeowners along a tributary to the Merrimack River regarding flooding in May 2006 and April 2007 which the homeowners attributed to the Dam's flashboards. In response, FERC sought information from Boott and subsequently ordered a backwater analysis to determine the effect of the flashboards on upstream flooding. The study revealed that the flashboards reacted unpredictably under water pressure and did not consistently fail as designed, so FERC ordered Boott to propose alternatives which could alleviate this issue.

Boott's report proposed three options: (1) continuing to employ the current flashboard system; (2) continuing to use flashboards but reducing the height of the wooden planks; or (3) replacing the flashboards with a five-foot-high pneumatic crest gate system. This latter option would entail installing a rubber membrane on top of the Dam so that its height could be mechanically raised or lowered as water conditions dictated by remotely inflating the membrane with pressurized air. After analyzing all three options, Boott concluded that the pneumatic crest control system was the best choice because it would eliminate the issue of the flashboards failing unpredictably, enhance project operational control and power generation, and provide significant advantages for other activities that are dependent on water levels, including flood control, recreation, and fish passage. Boott subsequently filed an application with FERC on July 6, 2010, to amend its license to permit installation of the crest gate.

---

1. The license was originally given to Boott Mills and Proprietors of the Locks and Canals on the Merrimack River but was transferred to the current licensees on April 1, 2005.

On August 10, 2010, FERC issued a Notice of Application for the amendment and sought comments, motions to intervene, and protests from the public. Interior, among others, filed motions primarily arguing that the proposed amendment would not solve the flooding issues and would create an adverse effect on the Dam by removing a feature of the Dam which the objectors believe to be an integral part of the Dam's historic engineering and structure.[2] In response, Boott modified its proposal to try to mitigate these effects. Despite almost three years of negotiations, the parties were unable to agree on a proposal. During this time, on December 19, 2011, FERC also issued an Environmental Assessment touting the long-term beneficial effects of the proposed amendment.

On April 18, 2013, FERC issued an order granting Boott's proposed amendment. 143 FERC P 61048 (2013). In its sixty-page order, FERC agreed with the findings in the Environmental Assessment and Boott's reports. It found that the inflatable crest gate would: "provide[ ] the most reliable and complete attenuation of the backwater effect that results from high flows," id. ¶ 50; increase worker safety since workers would no longer have to "approach the dam in boats, often during high flow periods" in order to replace the flashboards, id. ¶ 51; "improve fish passage," id. ¶ 83; help maintain "a consistent impoundment level [that] would benefit two utilities that use the impoundment as a source for water supply," id. ¶ 56; "allow the project to generate more clean energy" because the gates "could be reinflated relatively soon after high flows" as opposed to waiting for the flashboards to be replaced

through a process that took months, id. ¶¶ 48, 83; and "provid[e] a more stable reservoir elevation," id. ¶ 153.

FERC's order also "acknowledge[d] and appreciate[d] the national significance of the historic properties at issue" yet ultimately disagreed with Interior's position that replacing the flashboards would have an adverse effect on the Dam, and thus violate the Lowell Act. Id. ¶¶ 81, 134. According to FERC, while Boott's initial proposal created an adverse effect, the mandated alterations to the crest gate to mimic the appearance of the wooden flashboards—using a brown-colored bladder, painting the downstream side of the gate panels brown, and installing black retaining straps—along with two interpretive exhibits explaining both the original flashboard system and the modern pneumatic crest gate system would mitigate any negative effects of replacing the flashboards. Id. ¶ 24. With these added measures, FERC concluded there would be no adverse effect to the Dam, the Park, or the Preservation District. Id. ¶ 134. In coming to its decision, FERC noted that this mitigation approach to finding no adverse effect was similar to the approach taken and agreed to by Interior when a 1921 fishway was replaced with a more modern fish ladder in the 1980s. Id. ¶ 82.

Finally, FERC found that the pneumatic crest gate would not be inconsistent with Lowell Park's Preservation Standards. According to the order, the flashboards were not added to the Dam until 1838 and thus were not part of the original design or use of the Dam; at the very most, the flashboard system was a temporary crest control structure, which has been modified repeatedly over time, and not part of the

---

**2.** Interior's interest in the Dam stems from its oversight of the National Park Service, of which Lowell Park is a part. Because the Dam is part of the Park, and any modifica-

tions would therefore impact the Park, the Lowell Act requires consultation with the Secretary of the Interior.

"original" Dam design. Id. ¶¶ 86, 89. Moreover, FERC found that the original materials would not be altered because the wooden flashboards were repeatedly replaced, and thus were not "original" materials. Id. ¶ 143. Lastly, FERC found that it was not feasible to preserve the flashboard system since it did not work as designed and thus threatened homeowners in the flood zone, the migration of fish, the output from the Dam, and the safety of the Dam workers. Id. ¶ 2.

Unhappy with FERC's order, Interior and other aggrieved parties filed a request for rehearing. On September 19, 2013, FERC denied the request in a fifty-one-page order reaffirming its findings. 144 FERC P 61211 (2013). FERC explained that it had "consider[ed] the landmark status of the dam and Historic District," consulted "for more than two years on ways to avoid, minimize, or mitigate any adverse effects," and "requir[ed] measures to resolve [the] adverse effects." Id. at ¶ 45. As a result, "the proposed action would not adversely affect the dam and the Historic District." Id.

On November 18, 2013, Interior timely filed its petition for review of both decisions (collectively, the "Orders").

## II. Discussion

### A. Standard of Review

■■ We review FERC's Orders under the Administrative Procedure Act, 5 U.S.C. § 551. Knott v. FERC, 386 F.3d 368, 372 (1st Cir. 2004). Accordingly, we will only reverse an order if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Id. (quoting Wis. Valley Improvement Co. v. FERC, 236 F.3d 738, 742 (D.C. Cir. 2001)) (internal quotation marks omitted). An order is arbitrary, capricious, or an abuse of discretion if the agency fails to "examine[ ] the pertinent evidence, consider[ ] the rele-

vant factors, and articulate[ ] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Ruskai v. Pistole, 775 F.3d 61, 68 (1st Cir. 2014).

■ In undertaking this analysis, we "review FERC's findings of fact for 'substantial evidence,' and if so supported, such findings are conclusive." Knott, 386 F.3d at 371 (quoting Thomas Hodgson & Sons, Inc. v. FERC, 49 F.3d 822, 825 (1st Cir. 1995)) (internal quotation marks omitted). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Penobscot Air Servs., Ltd. v. FAA, 164 F.3d 713, 718 (1st Cir. 1999) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

■ In terms of statutory interpretation, the Chevron doctrine mandates that when Congress delegates authority to an agency with respect to a particular statute, that "agency's interpretation of a statute is entitled to weight when the statute is silent or ambiguous." Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin., 463 F.3d 50, 58-59 (1st Cir. 2006) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). However, when more than one agency could be tasked with interpreting a statute, neither is given deference. Salleh v. Christopher, 85 F.3d 689, 691 (D.C. Cir. 1996) ("Where ... two executive branch entities ... claim conflicting administrative authority, it would be inappropriate to defer to either's statutory interpretation...."). Instead, the Court interprets the statute de novo. Grant Thornton, LLP v. Office of Comptroller of the Currency, 514 F.3d 1328, 1331 (D.C. Cir. 2008). Similarly, pure legal errors "require no deference to agency

expertise." Knott, 386 F.3d at 372 (quoting Ne. Utils. Serv. Co. v. FERC, 993 F.2d 937, 944 (1st Cir. 1993)) (internal quotation marks omitted).

## B. FERC's Orders Are Neither Contrary to the Lowell Act nor Arbitrary and Capricious

### 1. Adverse Effect

■ Interior first argues that FERC's Orders violate the Lowell Act because granting Boott's amendment to replace the flashboards with the pneumatic crest gate creates an adverse effect forbidden by the Act.

According to the Lowell Act:

No Federal entity may issue any license or permit to any person to conduct an activity within the park or preservation district unless such entity determines that the proposed activity ... will not have an adverse effect on the resources of the park or preservation district.

16 U.S.C. § 410cc-12(b). Though the statute does not define "adverse effect," Interior asks that we defer to its interpretation of the term, which it argues is the same as that used in the regulations implementing the National Historic Preservation Act of 1966 ("NHPA"), id. § 470 et seq. In those regulations, an "adverse effect" is "found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1). Examples of adverse effects include:

(i) Physical destruction of or damage to all or part of the property;

(ii) Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous materi-

al remediation, and provision of handicapped access, that is not consistent with the Secretary's standards for the treatment of historic properties (36 CFR part 68) and applicable guidelines;

(iii) Removal of the property from its historic location;

(iv) Change of the character of the property's use or of physical features within the property's setting that contribute to its historic significance;

(v) Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features;

(vi) Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian tribe or Native Hawaiian organization; and

(vii) Transfer, lease, or sale of property out of Federal ownership or control without adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance.

Id. § 800.5(a)(2).

Interior contends that because the Lowell Act forbids activities that have an adverse effect and does not provide for minimization or mitigation of adverse effects, any undertaking that falls under the definition of "adverse effect" just described is prohibited. In Interior's view, the installation of the crest gate falls under this category because the flashboard technology is essential to the historic integrity of the Dam, and thus nothing can be done by FERC or Boott to salvage the undertaking and comply with the Act.

We decline to defer to Interior's definition of "adverse effect." The Lowell Act explicitly states that "No Federal entity may issue any license ... unless such enti-

ty determines that the proposed activity ... will not have an adverse effect on the resources of the park or preservation district." 16 U.S.C. § 410cc-12(b) (emphasis added). It is the licensing agency, in this case FERC, which has been delegated the authority to determine whether an adverse effect exists in any given licensing proceeding, and thus, if anyone, it would be FERC, and not Interior, which could be granted deference. However, because the Lowell Act delegates decisionmaking authority to multiple agencies—whichever agency is tasked with issuing the specific licence at issue—"it cannot be said that Congress implicitly delegated to one agency authority to reconcile ambiguities or to fill gaps." Salleh, 85 F.3d at 692.

As a result, the question then becomes one for the court on how to interpret "adverse effect on the resources of the park or preservation district" in order to determine whether the modifications will have such an effect. Interior argues that Congress, by its use of the term "adverse effect" meant to incorporate the pre-Lowell Act NHPA regulations defining the term to include, among other things, a prohibition on "alteration of all or part of a property" and on the "introduction of visual ... elements that are out of character with the property or alter its setting." 36 C.F.R. § 800.9(a), (c). But even assuming Congress's use of the term "adverse effect" was an incorporation of these regulations, the statute and those regulations allow a licensing agency to employ a more flexible analysis than that for which Interior argues.

First, the statute requires the licensing agency to consider the adverse effect on the "resources" of the park, a term the Lowell Act does not define. In its introductory section, the Lowell Act indicates that its purpose is to preserve "nationally significant historical resources." 16 U.S.C.

§ 410cc(a)(3). However, it uses the broader term "resources"—with no adjective—in its prohibition on adverse effects. This suggests that Congress wrote the statute to authorize licensing agencies to consider all the resources of the park, including factors such as fish, flood control, and power generation.

Moreover, the regulations do not prohibit any "alteration." The statute itself contemplates, for example, "minor improvements" to properties within the park. Id. § 410cc-23(a)(2). The regulations also do not prohibit the introduction of any "visual ... elements"; only those that are "out of character" with the property or its setting.

Indeed, recognizing that alterations to the Park would undoubtedly occur, and that they could result in an adverse effect, these same regulations provide procedures for reconciling the need to avoid adverse effects with the need for improvements and alterations to the Park. For example, the regulations direct the agency to "consult further to resolve the adverse effect pursuant to § 800.6." See 36 C.F.R. § 800.5(d)(2). Section 800.6, meanwhile, instructs the agency to "consult with [numerous parties] to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." Id. § 800.6(a).

Contrary to Interior's proposed interpretation, which simply cherry-picks provisions from the regulations that support its conclusion, we believe that the proper interpretation of "adverse effect" is one that applies the NHPA regulations as a whole, including the mitigation provisions. See Textron Inc. v. Comm'r, 336 F.3d 26, 33 (1st Cir. 2003) (rejecting the Commissioner's interpretation because that interpretation was "inconsistent and illogical" when the regulation was viewed "as a whole"); Heggie Corp. v. United States, 226 F.2d

353, 353 (1st Cir. 1955) ("[W]e find the language used to be clear and unambiguous, bearing in mind that the regulation must be read and interpreted as a whole, and that the language of [one section] should be read in conjunction with [a second section], which it obviously embellishes or modifies.").

This interpretation is consistent not only with Congressional intent, but also the history of Lowell Park. In 1983, FERC approved a modification to the Dam in which a fish ladder was replaced with a modern fishway and was then relocated to a different portion of the Dam. This modernization altered the Dam, changed the physical features of the Dam, and introduced visual elements different from the original fishway, all things which, under Interior's proposed interpretation, should constitute an automatic adverse effect prohibited by the Lowell Act. See 36 C.F.R. § 800.5(a)(2)(i), (iii), (v). Yet, Interior did not object to the modification because the new fish ladder would be accompanied by an interpretive exhibit explaining the historic and engineering characteristics of the original ladder. This, along with additional aesthetic modifications, is one of the key mitigating measures in the present case.[3]

FERC, for its part, never explicitly adopts a definition of "adverse effect." Its Orders do, however, seemingly apply—or at least accept—the NHPA regulations' definition of "adverse effect." Unlike Interior, however, FERC applies the entire definition, including the ability to resolve adverse effects through mitigation and minimization in order to allow for a no

adverse effect finding as required by the Lowell Act. This approach is in full accord with our interpretation, discussed above, and thus is not contrary to the Lowell Act.

We are thus left to evaluate whether FERC's no-adverse-effect determination, and subsequent grant of Boott's application to amend its license, was nevertheless arbitrary or capricious. After thoroughly reviewing the record, we conclude that it was not.

There is ample record evidence to support FERC's finding that the flashboard system failed unpredictably and inconsistently, and that this could lead to increased flooding under certain circumstances. Similarly, the record supports FERC's conclusion that, as compared to the flashboards, the pneumatic crest gate will result in more steady water levels, increased fish passage, increased power generation, and a safer working environment for those working on the Dam, and thus is a better option from a hydroelectric engineering standpoint. These factual findings—based on the 2004-2007 project operation review, the Boott backwater analysis report, the technical assessment report, the Environmental Assessment, and discussions between FERC, Boott, and numerous interest groups—go almost entirely unchallenged in the record, and thus clearly satisfy the substantial evidence standard. See Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014) (explaining that the "appropriate principles of administrative deference" include "the familiar and deferential substantial evidence standard," which means that a court will "re-

---

**3.** Interior tries to distinguish the two projects by arguing that the fish ladder only spans ten percent of the Dam, while the flashboards span the entire Dam. This distinction is unpersuasive. In both cases, the proposed modification altered the Dam's appearance and removed some of its historical features in order to modernize and increase the effective-

ness of the Dam, and in both cases, FERC found that any potential adverse effects caused by these modifications would be mitigated by an interpretive exhibit (and, in the case of the crest gate, additional aesthetic modifications). The percentage of the Dam affected was not determinative in 1983 and is not determinative now.

spect [the agency's] findings so long as they are 'supported by reasonable, substantial, and probative evidence on the record as a whole.'" (quoting Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013); Larios v. Holder, 608 F.3d 105, 107 (1st Cir. 2010)) (internal quotation marks omitted))..

At the same time, the record shows that FERC and Boott worked with Interior and the other opponents of the proposal for over two years to reach a compromise. Despite being unable to reach one, FERC still required Boott to alter the appearance of the pneumatic crest gate to mimic that of the flashboards and to create two interpretive exhibits to explain the flashboard system. In FERC's view, these actions— whether one calls them minimizing, mitigating, or avoiding adverse effects—permitted a finding of no adverse effect as required under the Lowell Act. Given FERC's findings, the ongoing discussions with the crest gate's opponents, and the fact that similar modifications and exhibits resulted in a no-adverse-effect finding the last time the Dam was modified to upgrade the fish ladder, we are hard pressed to find that FERC's conclusion of no adverse effect, and thus its Orders granting Boott's amendment, was arbitrary or capricious. To the contrary, its decision appears to be reached by "'reasoned decisionmaking,' including an examination of the relevant data and a reasoned explanation supported by a stated connection between the facts found and the choice made." Knott, 386 F.3d at 372 (quoting Ne. Utils. Serv. Co., 993 F.2d at 944) (internal quotation marks omitted); see also Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) ("A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" (quoting Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971))).

## 2. Preservation Standards

Interior also argues that FERC's Orders are contrary to the Lowell Act because they violate the standards and criteria established to protect Lowell Park. Interior emphasizes that the Lowell Act mandates that "[n]o Federal entity may issue any license or permit to any person to conduct an activity within the park or preservation district unless such entity determines that the proposed activity will be conducted in a manner consistent with the standards and criteria" established by the Lowell Historic Preservation Commission (in consultation with the Commonwealth of Massachusetts, the Secretary of the Interior, and the city manager of Lowell). See 16 U.S.C §§ 410cc-12(b), 410cc-32(e). Interior argues that replacing the wooden flashboards with the pneumatic crest gate violates two of these standards, Standard E-2 and Standard E-3.

Standard E-2 concerns "Historic Architectural Features" and the fact that "[h]istoric buildings owe their character to the particular blend of their architectural features: scale, rhythm, form, massing, and proportion." 46 Fed. Reg. 24000-03(2)(a) (Apr. 29, 1981). Accordingly, Standard E-2 states that "[o]riginal building features should whenever feasible be preserved rather than replaced" and that "[b]uiling complexes constructed over time, ... when rehabilitated, should retain the appropriate historic design characteristics of each of their components. The imposition of historically unsympathetic architectural treatments should be avoided." Id. at (2)(b). Interior argues that replacing the wooden flashboards with a steel-and-concrete crest does not retain the original features of the Dam and would alter its masonry structure. FERC, however, disa-

greed. In its Orders, FERC concluded that the flashboards were not "original features" but rather were "temporary crest control structure[s]" and "not part of the dam's architecture." In support of this conclusion, FERC pointed out that the flashboard system varied over time: the Dam had no flashboards from 1826-1838, two-foot flashboards from 1838-1883, three-foot flashboards from 1883-1896, and five-foot flashboards since 1896. Given that the Dam had been built for years before the flashboard system was implemented and that the flashboards are specifically designed to fall out and be replaced, FERC's finding that the flashboards are not an "original feature" of the Dam is reasonable, even if it is not the only conclusion that could be reached from the record evidence. See Penobscot, 164 F.3d at 718 ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." (quoting Am. Textile Mfrs. Inst. v. Donovan, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981)) (internal quotation marks omitted)).

FERC also found that preserving the flashboard system was not "feasible" because the flashboards failed incompletely and inconsistently—regardless of alterations made to the size and design of the flashboards—and thus could contribute to flooding and other problems. This conclusion is supported in the record by a report reviewing project operations from 2004-2007, a backwater analysis conducted by Boott at FERC's request, and a technical assessment report commissioned by Boott. Because both this finding and the non-original feature finding are supported by substantial evidence, and thus given "the benefit of the doubt" by this Court, id. (quoting Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359, 377, 118 S.Ct.

818, 139 L.Ed.2d 797 (1998)), we find no violation of Standard E-2.

We reach a similar conclusion regarding Standard E-3, which concerns "Historic Materials." 46 Fed. Reg. 24000-03(3). The standard counsels that "[i]f immediate complete restoration cannot be accomplished, the preservation of deteriorating materials should be assured through partial or temporary measures to stabilize and protect them." Id. at (3)(b). It then lists the materials most commonly found in Lowell and "appropriate substitute materials." Id.

Interior contends that FERC violated Standard E-3 because its Orders allow for the removal of the wooden flashboards and the installation of a steel-and-concrete crest, which would not only transform the Dam but also use entirely different materials to do so. FERC's Orders, meanwhile, reiterated that the flashboards were not "original materials" because the flashboard system was not an original feature of the Dam and because the flashboards were continually replaced. The original materials, according to FERC, are the Dam's granite capstone and masonry, which would remain intact and unaffected by the installation of the crest gate. For the same reasons discussed above in the context of Standard E-2, we find there to be substantial evidence in the record to support this conclusion. Penobscot, 164 F.3d at 718 ("The 'substantial evidence' test ... ['r]equires ... merely the degree that could satisfy a reasonable factfinder.'" (quoting Allentown Mack, 522 U.S. at 377, 118 S.Ct. 818)).

### III. Conclusion

Despite Interior's protestations to the contrary, FERC's Orders are not inconsistent with the Lowell Act and are neither arbitrary nor capricious. At the end of the day, Interior simply disagreed with

FERC's evaluation of the evidence and with FERC's ultimate conclusions, and that is not enough to overturn the agency's Orders.

**Petition denied.**